ROGER J. AU & SON, INC. ET AL., APPELLANTS, *v.* NORTHEAST OHIO REGIONAL SEWER DISTRICT ET AL., APPELLEES.

(Nos. 49976, 49977, 49986 and 49987 — Decided April 7, 1986.)

*Baran & Baran* and *Edward C. Baran,* for appellant Roger J. Au & Son, Inc.

*Arter & Hadden, Hugh M. Stanley, Jr.,* and *Barry J. Miller,* for appellant Aetna Casualty & Surety Co.

*Squire, Sanders & Dempsey, Thomas S. Kilbane* and *George M. von Mehren; William B. Schatz* and *Paul T. Murphy,* for appellee Northeast Ohio Regional Sewer Dist.

*McNeal, Schick, Archibald & Biro* and *Albert J. Biro,* for appellee Euthenics, Inc.-Polytech, Inc.

NAHRA, J.   Appellants, Roger J. Au & Son, Inc. ("Au") and Aetna Casualty & Surety Company ("Aetna"), seek reversal of an entry granting appellee Northeast Ohio Regional Sewer District ("NORSD") partial summary judgment on certain claims of Au. For the reasons set forth herein, we reverse the judgment of the trial court and remand the portion of the case before us for disposition consistent with this opinion.

Viewing the evidence in a light most favorable to appellants, the following appears from the record.

Au entered into a contract with NORSD on June 21, 1977 to build a portion of the Cuyahoga Valley Interceptor Project, a sewer project. This contract was entered pursuant to a bid submitted by Au, the bid having been compiled on the basis of plans and specifications prepared by NORSD's agent, Euthenics, Inc.-Polytech, Inc. ("Euthenics"). The plans and specifications included soil borings taken by Euthenics reflecting soil conditions to be encountered by the contractor. Also included were alternative methods of sewer installation, one of which was pipe jacking.

Au's bid was predicated on the assumption that it would be able to use the jacked-pipe method of construction for the vast majority of the job. This assumption was partly based on the soil conditions, as reflected in the soil borings in the plans and specifications, that Au expected to encounter during the course of its performance. Au's expectations concerning the method of construction to be used were made known in a May 16, 1977 letter to NORSD, which stated, in part:

"We propose to machine mine the tunnel with a tunnel boring machine. The TBM will be a wheel type, electrically powered. The body of the TBM will be a circular shield approximately 10 feet long. The machine will be propelled by cylindrical jacks located at the rear of the shield which will react against reinforced concrete pipe which will be jacked in place."

The letter later went on to observe:

"In the event the pipe should freeze up and cannot be jacked further, either by the primary or intermediate jacks, we would commence installing ribs and lagging, or other primary support, in order to complete that particular pipe run. From the point of freeze up to the next working shaft, reinforced concrete pipe would be winched in place and the annular space between the primary lining and the pipe would be filled with cement grout. This procedure would be used only if we could not receive permission to install a working shaft at the point of freeze up."

In a June 6, 1977 letter from Au to NORSD, Au sought permission to install 72" pipe rather than 66" pipe as provided by the contract. Au indicated in the letter that the size change would ease the transition to installing by method of ribs and lagging in the event of pipe freeze-up. A change order, D-1, was approved by NORSD on July 21, 1977, authorizing the use of 72" pipe.

Au's performance almost throughout the job was impaired by extremely difficult soil conditions. Communication, written and oral, between Au and NORSD about problems resulting from these conditions was continuous, and NORSD had numerous people representing it on site throughout Au's performance who were aware of the problems, all of which is reflected below.

I

Au notified NORSD by letter dated November 16, 1977 that on October 18, 1977, it had experienced a "sudden boiling up" and heaving of its shaft at Station 360 + 00, apparently caused, the letter indicated, by ground conditions not contemplated by the plans and specifications. Au stated that the conditions were causing extra costs and delays, and that Au would keep NORSD apprised of its additional costs and any extra time it would need.

A February 6, 1978 daily report of one of NORSD's on-site representatives reflects that Au's tunnel boring machine was severely flooded at Station 355 + 36, and that the tunnel was silted up for about 30 feet. This problem resulted, according to an affidavit for Au, from soil conditions not disclosed in the plans and specifications.

Au sent a letter to NORSD dated February 9, 1978 summarizing a February 8 meeting at which representatives from AU, NORSD and Euthenics were present. The letter stated Au had indicated at the meeting that a layer of "saturated, silty, fine sand" was en-

countered at Station 354 + 40 and that this material had flowed into the tunnel boring machine and flooded the tunnel. The machine's motor was removed, dried and overhauled, and the tunnel pumped out. Jacking was resumed on February 6, 1978, when the flooding, as already indicated, recurred. Au estimated that construction would have to be by the open cut method for approximately the next 150 to 250 linear feet. The letter closed seeking assurances that extra costs for open cut mining "in this bad ground area" would be reimbursed to Au by NORSD.

In a March 3, 1978 letter from NORSD to Au, NORSD indicated it would not pay Au for 72" pipe the latter was storing off site. One of the reasons cited for this refusal was as follows:

"[T]he distinct possibility exists that, because of the soil conditions that may be encountered during the course of the contract, Roger J. Au & Son, Inc. may have to revert from 72" jacking pipe to 66" cast-in-place pipe, as was originally specified in the contract. In this case the 72" jacking pipe already paid for would again be useless."

A May 30, 1978 internal memo of NORSD summarized a May 19, 1978 meeting between representatives of Au and NORSD, the purpose of which was "to discuss difficulties encountered by the contractor during the course of construction." Various aspects of the problems already recounted herein were discussed. In addition, the following was memorialized:

"William Schatz[1] told all parties present that extras will be discussed when the job is completed. Mr. Au agreed to that, and stated that as the contractor, he too felt that the completion of the project was the most important objective, and that it must be ac-

---

[1] William Schatz was general counsel for NORSD.

complished in the cheapest way possible. No padding will take place. This job should not be dragged out, and it was his feeling that both sides are adequately protected."

The June 1, 1978 monthly report of an on-site representative for NORSD states that: "The inability of the contractor to complete his jacking runs in the soft ground continues to slow things down." A daily report from the same source dated June 18, 1978 shows "the line froze for good." It is reflected in an Au affidavit that the contractor pipe jacked from Station 360+08 to 363+36 between June 6 and June 15, 1978, when soil conditions made further pipe jacking impossible, and that: "Sewer District personnel were immediately apprised of the situation.* * *"

Au sent NORSD a "Payment Breakdown," dated June 23, 1978, indicating the price for its "revised method of construction utilizing ribs and lagging." The "total bid price" was shown in the letter as $354 per linear foot. An affidavit of Roger J. Au states that the June 23, 1978 payment breakdown was submitted at the insistence of NORSD, which had conditioned partial payment on receiving it.

NORSD's daily report of July 18, 1978 narrated that hand mining was going very slowly because of "rapidly changing ground, wet silt, sand, etc." Its monthly report dated September 1, 1978 stated:

"The soft ground in this area has made the mining and jacking method of tunneling very difficult.* * *

"The method of tunneling chosen for this job (jacking) is not suitable for the type of ground encountered."

These observations were reiterated in the October 1, 1978 monthly report: "Ground conditions are not suitable to the methods and equipment being used." Further, that report forecasted: "It is anticipated that ribs and lagging will be needed for the majority of the run from 370+00 to 391+25." A November 6, 1978 daily report stated: "Jacking operation from shaft #4 shut down — preparing for ribs and lagging." As indicated by a December 1, 1978 monthly report, pipe jacking was abandoned for the remainder of the project sometime prior to that date "in favor of ribs and lagging," which was reported to be succeeding.

An internal Au memo, summarizing a December 27, 1978 meeting at NORSD between representatives of the parties, stated that the meeting's purpose was to discuss conditions encountered by Au in its performance of the contract. Au apparently presented formal claims in writing at the meeting, and indicated: "[T]hese claims had placed Au at the extent of their [sic] financial capability. The remainder of the construction in bad ground would be at the direction of the Cleveland Regional Sewer District." The memo further stated that Au was taking the position it was dealing with a differing site condition, and would seek reimbursement from NORSD for extra costs resulting to it.

Change Orders 4 and 5, approved by NORSD on June 22 and June 27, 1979, respectively, authorized compensation to Au in the amount of $2,381,479 for extra costs to Au in tunneling between Stations 354+44 and 360+10. Specifically, Change Order 4 granted $950,634 for dewatering, machinery recovery and related activity; Change Order 5 granted $1,430,845 for use of the open cut construction method. Both of these change orders indicated that the extras encountered by Au were the result of unforeseen ground conditions.

Au notified NORSD by letter of August 22, 1979 of "differing site conditions in the area between Station 395+00± to Station 417±." It noted extreme problems developing concerning rib supports in the tunnel, which were deforming because of unforeseen

ground conditions. An immediate investigation by NORSD was urged because of safety concerns. Moreover, Au continued:

"Not only are we concerned about the existing tunnel construction, we are greatly concerned about the integrity of the finished project. The tunnel may well not be designed to deal with the conditions we are encountering. In any event, finished tunnel integrity and project cost minimization require immediate response and action."

, Au and NORSD entered into a "Memo of Understanding" on September 21, 1979, in which it was agreed that Au could use 60" pipe instead of 66" pipe, subject to approval by the EPA and certain other conditions. Further, the agreement provided that Au relinquished any equitable cost adjustment claims concerning a differing site condition between Stations 395 + 00 and 417 + 00 for extra costs accruing for construction in that area to the date of the agreement's execution.

Per its letter of January 24, 1980, Au noticed NORSD that problems had developed in the area between Stations 356 + 75 and 360 + 00 with respect to silt accumulation and pipe movement. A May 27, 1980 letter from Au to NORSD indicated more problems "in the vicinity of Shaft #3, Station 360 + 00 which is in the area of the Changed Condition about which you were notified on January 22, 1980." The letter stated there was approximately 2 feet of accumulated silt in Shaft #3, increased waterflow, and pipe joint separation south of the shaft.

Au filed suit against NORSD and Euthenics on August 3, 1981. It sought damages from NORSD on several theories, one of which, under Count Two, was that Au had been damaged because of soil conditions different from those reflected in the plans and specifications. In particular, Paragraph 14 of the complaint alleged:

"Shortly after the inception of the project, Au encountered subsurface conditions substantially and materially different from those reported in the contract documents and after calling such conditions to the attention of the defendants, requesting additional compensation by virtue of such changed condition, Au was directed to continue and complete performance of the contract and was indeed, for a time paid for its changed conditions encountered."

Au's attorney notified NORSD by letter dated July 19, 1984, that a consultant for Au had completed review and analysis of the construction project, and that a claim summary of additional costs "as the result of the misdesign of the project" was attached. That summary indicated $4,148,529.93 in damages, plus interest of $1,555,698.72. About $2.95 million of the damages claim concerned extra costs associated with the switch to ribs and lagging from pipe jacking.

NORSD sought summary judgment as to about $3,428,786 of the damage claims delineated in the July 1984 letter, and also as to the $1.5 million interest claim. It cited as the basis for its motion Au's alleged failure to comply with notice provisions of the contract regarding the specific damages set out in the letter, as well as Au's alleged failure to plead those damage claims sufficiently in the complaint. The trial court, in a two-sentence entry, granted in its entirety the summary judgment sought and determined there was "no just reason for delay."

## II

This court has some concern whether the judgment appealed from is a final order subject to appellate review. As we stated in *Norvell* v. *Cuyahoga County Hospital* (1983), 11 Ohio App. 3d 70, an order which disposes of only part of a single cause of action is nonfinal and nonappealable, despite the fact that it contains the phrase "no just reason for

delay." We shall nonetheless treat the order as final and address the issues raised by the parties. The assignments of error and arguments of Au and its surety, Aetna, are essentially similar, and shall be treated together.

### III

Appellants propose at the outset that Au was not required to give notice at any time prior to its July 1984 letter of either the basis of the damages claims set forth therein or the specific nature of those claims.[2] This assertion is based on section FSR-2 of the contract, the "changes clause," which provides in relevant part:

"(a) The Owner may, at any time, without notice to the sureties, by written order designated or indicated to be a general order, make any change in the work within the general scope of the contract, including but not limited to changes:

"(1) In the specifications (including drawings and designs);

"(2) In the method or manner of performance of the work;

"(3) In the Owner-furnished facilities, equipment, materials, services or site; or

"(4) Directing acceleration of the performance of the work.

"(b) Any other written order or oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation, or determination) from the Owner which causes any such change shall be treated as a change order under this clause, *provided* that the Contractor gives the Owner written notice stating the date, circumstances and source of the Order and that the Contractor regards the Order as a Change Order.

"(c) Except as herein provided, no order, statement, or conduct of the Owner shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

"(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or time required for, the performance of any part of the work under this contract, whether or not changed by order, an equitable adjustment shall be made and the contract modified in writing accordingly; *Provided, however,* that except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required; *And provided further, that in the case of defective specifications for which the Owner is responsible, the equitable adjustment shall include any increase of cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.* [Emphasis added.]

"(e) If the Contractor intends to assert a claim for an equitable adjustment under this clause, he must, within 30 days after receipt of a written change order under (a) above, or the furnishing of a written notice under (b) above submit to the Owner a written statement setting forth the general nature and

---

[2] This theory is presented by Aetna's third assignment of error and by Au's first legal argument, which respectively assert:

"3. The trial court erred in its grant of partial summary judgment because the construction contract entered into between Roger J. Au & Sons [*sic*], Inc. and the Northeast Ohio Regional Sewer District did not require notice as a condition precedent to a claim by the contractor based on defective specifications."

"1. Summary judgment was inappropriate in light of the contract between the parties which provided that no notice whatsoever was required by the contractor as a precondition to the assertion of a claim based upon defective specifications."

monetary extent of such claim, unless this period is extended by the Owner. The statement of claim hereunder may be included in the notice under (b) above.

"(f) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this·contract."

Appellants argue that no notice was required because the damage claims in the July 1984 letter are based on defective specifications — namely, NORSD's indication that the job could be performed by pipe jacking — and thus that the claims are excepted from the twenty-day notice requirements provided by paragraph (d) of the changes clause.

We must agree with appellees that the whole tenor of Au's complaint under Count Two, on which appellants rely to sustain the July 1984 damages claims, concerns claims based on *differing site conditions,* rather than defective specifications. Thus, even assuming appellants are correct that no notice is required for a claim under the changes clause based on defective specifications — something we do not here decide — we hold that no such claim was pleaded, and that the changes clause is therefore inapplicable to the July 1984 claims.

### IV

Appellant's second basic argument contends that the July 1984 damages claims are based on differing site conditions Au encountered, and that there is at least a question of fact about whether it complied with the notice provision of the "differing site conditions clause."[3] That provision, FSR-3 states:

"(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Owner in writing of:

"(1) Sub-surface or latent physical conditions at the site differing materially from those indicated in this contract; or

"(2) Unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in this contract. The Owner shall promptly investigate the conditions, and if it finds that such conditions do materially so differ and cause an increase or decrease in the contract or Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

"(b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above: *Provided,* however, the time prescribed therefor may be extended by the Owner.

"(c) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract."[4]

---

[3] Aetna's fourth assignment of error and Au's second legal argument respectively assert:

"4. The trial court erred in its grant of a partial summary judgment because the construction contract entered into between Roger J. Au & Sons [*sic*], Inc. and the Northeast Ohio Regional Sewer District did not require continuous notifications of differing site conditions, coupled with exact dollar claim amounts, for contractor claims based on differing site conditions."

"2. Summary judgment was inappropriate in the circumstances of this case wherein questions of fact exist as to whether or not the claims of the contractor, whether in writing or not, were within the knowledge of sewer district officials."

[4] Appellee asserts initially that this argument must fail on its face because of the stricter notice provision at Section GC-37 of the contract, entitled "Claims for Damages," subsection (A) of which provides:

FSR-3 requires only that the contractor give notice to the owner, here NORSD, of soil conditions which differ materially from those indicated in the contract. While this notice must be prompt, written, and prior to disturbance of the condition, specific damage claims based on differing site conditions may be presented any time prior to final payment.

The record reflects continuous and frequent written notice from Au to NORSD regarding problems the former was encountering because of soil conditions. It is a question of fact concerning whether, or to what extent, the written notice provided was intended by Au and understood by NORSD to relate to the soil conditions throughout the job. It is unclear from the record whether the "bad ground" initially encountered by Au was so symptomatic and predictive of the soil conditions which troubled its performance throughout that the early notices of differing site conditions were understood by the parties to provide general notice that all of the ground was really a differing site condition.[5] Whether actual, prompt and written notice was given may not be critical, however, as there is also a real question of fact, discussed *infra*, whether NORSD had timely constructive notice of the differing site conditions of which Au's July 1984 claims are based.

## V

Appellants propose that even if Au was found to have failed to meet the formal notice provisions of FSR-3, NORSD was arguably aware of differing site conditions throughout the job, and Au could therefore seek extras based on them despite any lack of written notice.[6] We agree.

Appellants cite an abundance of case authority construing the notice requirements of the differing site conditions and changes clauses which indicates a failure of written notice may be harmless if there is constructive notice to the owner of the differing conditions. For

---

"If the Contractor makes claim for any damages alleged to have been sustained by breach of Contract or otherwise, he shall, within (10) days after occurrence of the alleged breach or within ten (10) days after such damages are alleged to have been sustained, whichever date is the earlier, file with the C.R.S.D. a written itemized statement, in triplicate, of the details of the alleged breach and the details and amount of the alleged damages. The Contractor agrees that unless such statement is made and filed as so required, his claim for damages shall be deemed waived, invalid, and unenforceable, and that he shall not be entitled to any compensation for any such alleged damages."

We hold that Section GC-37 does not apply to Au's differing site conditions claim because it is superseded by FSR-3, *supra*. This is because Section 1(a) of the FSR (federal and state requirements) provides that the FSR provisions take precedence over any conflicting provisions of the contract. The stricter notice requirements of Section GC-37 regarding differing site conditions claims clearly conflicts with FSR-3.

[5] Such a finding could well be supported by the March 3, 1978 letter from NORSD to Au, in which it was stated that 66" pipe might have to be used during the rest of Au's performance because of the "distinct possibility" that the ground conditions might require such use.

[6] This argument is set forth at Au's third legal argument and at Aetna's fifth assignment of error, as follows:

"3. Summary judgment was inappropriate in the circumstances of this case wherein questions of fact exist as to whether or not the claims of the contractor, whether in writing or not, were within the constructive notice of the sewer district officials."

"5. The trial court erred in its grant of partial summary judgment because the appellee, Northeast Ohio Regional Sewer District, had constructive notice of the conditions encountered by the contractor."

example, the headnote in *Nelson Bros. Constr. Co.* (1977), 77-2 BCA, ¶12660, states:

"Changes — Formal Requirements — Notice of Claim — Actual Knowledge

"Failure to give formal notice of changes claims did not bar the claims because responsible officials were aware of the facts giving rise to the claims. A defense based upon lack of notice does not apply if such officials as a project inspector, COR, or project engineer had actual knowledge of the circumstances upon which the claim is based, nor is notice required for extra expenses that result from a work order. Such circumstances give actual knowledge of the basis for the claim and no prejudice results from a failure to receive notice."

We think that the view expressed in *Nelson Bros. Constr. Co., supra,* comports with common sense as applied to Au's differing site conditions claims. There is no reason to deny the claims for lack of written notice if NORSD was aware of differing soil conditions throughout the job and had a proper opportunity to investigate and act on its knowledge, as the purpose of the formal notice would thereby have been fulfilled. Whether NORSD had actual knowledge of differing site conditions and an ade-quate opportunity to investigate them are, on this record, unresolved questions of fact. It should again be emphasized that FSR-3 permits the contractor to specify the exact nature of his claims and to seek equitable adjustment of the contract price for them any time prior to final payment, *provided* the owner has adequate notice of the underlying conditions on which the claims are based — again, here a question of fact in dispute.

Because we think there is ample evidence in the record to support an inference that NORSD received the notice required under FSR-3, or that timely constructive notice existed as to differing site conditions existing throughout the job, appellants' arguments concerning notice under FSR-3 are sustained. Au's July 1984 claims are therefore not barred as a matter of law for lack of notice.[7]

## VI

Appellants' next argument asserts that any alleged lack of formal written notice to NORSD regarding differing site conditions may not be held to bar Au's claims for extra costs associated with those conditions, absent a showing by NORSD that it was prejudiced by such failure of notice.[8]

[7] In their arguments regarding the adequacy of notice to NORSD of differing site conditions, appellants challenge NORSD's assertion that any claims regarding expense for ribs and lagging were waived by Au. We agree with appellants that it is at least a question of fact whether there was such a waiver and, if so, to what extent extras for ribs and lagging were understood by the parties to be waived. That is, we see nothing in the record conclusively demonstrating waiver of these claims. Our conclusion is not altered by NORSD's repeated assertion, true or not, that Au did not think it had claims for extras regarding ribs and lagging until well after it had stopped performance. Any lack of awareness of Au in this respect is irrelevant in view of the language of FSR-3 permitting monetary claims *any time* prior to final payment.

[8] This theory is reflected in Au's fourth legal argument and Aetna's sixth assignment of error:

"4. Summary judgment was inappropriate in the circumstances of this case wherein genuine issues of material fact exist. The moving party is not entitled to summary judgment as a matter of law and the sewer district did not demonstrate clear and convincing evidence of actual prejudice with respect to the question of notice."

"6. The trial court erred in its grant of partial summary judgment because the appellee Northeast Ohio Regional Sewer District, was not actually prejudiced by the alleged lack of appropriate notice by the appellant, Roger J. Au & Sons [sic], Inc."

In view of our conclusion that constructive notice to NORSD of allegedly differing site conditions is a sufficient basis under FSR-3 for Au to ground its July 1984 claims, the question of whether NORSD was prejudiced by any lack of formal notice is rendered moot. To the extent appellants mean to argue that even if NORSD lacked *constructive notice* of differing site conditions, Au may bring claims based on such conditions, however, we reject their arguments as contrary to the language of the contract and to the policy underlying its requirement of notice — namely, to make the owner aware that monetary claims for extras may be forthcoming, and to give it an opportunity to investigate the conditions and minimize costs in dealing with them.

## VII

Finally, appellants contend that in the event the trial court granted NORSD's summary judgment motion on the ground the July 1984 claims were not pleaded — an argument made by NORSD below — the complaint contained sufficient allegations to cover those claims.[9] Appellee NORSD has not seriously pressed on appeal its argument to the trial court that the damages claims delineated in Au's July 1984 letter are barred because they were not supported by Au's complaint.

Appellants correctly point out that Paragraph 14 of Au's complaint (see

*supra*) alleged NORSD was aware of differing site conditions early on, and that appellee established a general policy against compensating claims based on such conditions until the total job was completed. We agree that Paragraph 14, if not others, of the complaint set forth sufficient operative facts to give fair notice to NORSD that Au would be seeking damages based on allegedly differing site conditions, including those damages set forth in the July 1984 letter.

Judgment reversed and remanded.

*Judgment accordingly.*

JACKSON, J., concurs.

PRYATEL, J., concurs in judgment only.

---

[9] Au's fifth legal argument and Aetna's seventh assignment of error provide, respectively:

"5. Summary judgment was inappropriate in that no new claims were injected into this action by means of such supplemental pleadings."

"7. The trial court erred in its grant of partial summary [judgment] because the complaint and supplemental complaints of appellant, Roger J. Au & Sons [*sic*], Inc. provide adequate notice of appellant's claims, pursuant to notice pleading under Ohio law."