**R.J. WILDNER CONTRACTING
CO., INC., Plaintiff,**

v.

**OHIO TURNPIKE COMMISSION,
Defendant.**

No. 1:95CV0696.

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 26, 1996.

Robert L. Tucker, Karen K. Grasso, Buckingham, Doolittle & Burroughs, Akron, OH, for R.J. Wildner Contracting Co. Inc.

Alan Neil Hirth, Thomas M. Wilson, Mark E. Leskovec, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, for Ohio Turnpike Commission.

Hugh M. Stanley, Jr., Arter & Hadden, Cleveland, OH, for Hugh M. Stanley.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

R.J. Wildner Contracting Company brought this diversity action against the Ohio Turnpike Commission (OTC) for breach of contract, misrepresentation, recision of a contract, superior knowledge, unjust enrichment, and conversion. After the OTC answered the original complaint, Wildner asked for and received leave to file an amended complaint. The OTC has now moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss each count of the amended complaint for failure to state a claim upon which relief can be granted. The OTC has also moved pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss count V of the amended complaint for lack of subject matter jurisdiction. For the reasons which are stated below, the OTC's motion to dismiss is granted in part and denied in part.

### I.

Wildner is a Pennsylvania corporation with its principal place of business in Johnstown, Pennsylvania. The OTC is an instrumentality of the state of Ohio, created by the state as a "body both corporate and politic" and with its principal place of business in Berea, Ohio. Ohio Rev.Code § 5537.02(A). In 1993, Wildner and OTC entered into a written contract for the stripping and recoating of the Huron River Bridge, located on the Ohio Turnpike in Erie County, Ohio. Wildner incorporated the contract into its amended complaint by reference. According to the contract, the

major work to be performed ... consists of the following: Removal of the existing lead based paint within engineered containment systems; disposal of hazardous and non-hazardous waste; employee and environmental protection; and recoating the existing bridge steel with an epoxy organic zinc-rich primer, a high build epoxy intermediate coat, and a urethane protective coat.

Contract, § SP 101.

The contract estimated that the bridge covered 205,300 square feet and that approximately 35 tons of hazardous and non-hazardous waste would be generated during the removal process. As it turned out, the bridge actually covered 213,149 square feet. More importantly, the existing paint was much thicker than Wildner anticipated ("abnormally thick" in the language of Wildner's complaint) and far more waste was generated. In addition, removing the thicker coating required a greater expenditure of labor, materials and time than Wildner had anticipated. Wildner alleges that the OTC had information in its files which indicated that the coating was abnormally thick, but did not share this information with Wildner.

Wildner sought compensation from the OTC for this work, which it characterized as "extra work," in accordance with §§ G–4.02 and G–4.03 of the contract. Section G–4.02 ("Increased or Decreased Quantities") provides:

> The Chief Engineer may by written instructions to the Contractor order increases or decreases in the quantity of work as he may deem necessary or desirable to carry out the performance of the work. The quantity of any item in the original contract, except lump sum items, may be increased regardless of the percentage provided the total increase and cost of the item does not exceed $5,000, or the quantity may be increased not to exceed 25% provided the total increase of the cost of an item does not exceed $30,000. Such increases shall be designated on change orders as additions to the additional contract, and the unit price in the original contract shall apply.

> Decreases may be made in the quantity of any item, except lump sum items, in the original contract or an extra work contract. Cancellation shall be authorized by change order and shall be designated as non-performed under the appropriate heading.

> A contract for extra work is required if the addition to the quantity of any bid item is in excess of those described above or for work for which the contract does not contain a bid price.

> If, during the course of the work, it becomes apparent that there will be an overrun or underrun in proposal quantities, for whatever reason, such overrun or underrun shall be governed by the procedures set forth in this section.

Section G–4.02 is explicitly amended by § SP 105 ("Increased or Decreased Quantities"), which adds the following language:

> The Contractor's attention is directed to Item SP 525—Hazardous Waste Classification, Handling, and Disposal and Item SP 525—Non–Hazardous Waste Classification, Handling, and Disposal. The quantities shown for these items were determined from the best available information that existed during the preparation of the Plans and the estimates of quantities. In addition, at this time it is not known if the waste material will be hazardous or non-hazardous. Therefore, the Contractor is cautioned that the estimates of the quantities of these items (which estimate, as in other cases, is for bidding and bonding purposes only) are necessarily more speculative than estimates of some other types of work. Payment will be made in accordance with the unit price bid or when applicable, in accordance with the procedures set forth in G–4.02.

The next section, § G–4.03 ("Extra Work"), defines extra work and provides:

> "Extra Work" is unforeseen work, including changes in any work which is made necessary by alteration of Plans, or necessary to complete the work or for other reasons, and which is ordered pursuant to Section G–4.02 or G–5.01. Extra work shall be performed by the Contractor as directed by the Engineer. In any situation deemed by the Engineer to be an emer-

gency in which he shall consider such action necessary in order to save or protect life or property, he may require the performance of extra work by oral direction to the Contractor, which oral direction shall, however, be as promptly as possible confirmed in writing. In all other cases extra work shall be performed only after delivery to the Contractor of the Engineer's written order or direction therefor.

Section G–5.01 ("Authority of Engineer"), which § G–4.03 references, provides, in pertinent part:

The Engineer shall have authority to require the Contractor to perform extra work, including changes in work, whether or not the work to be changed shall already have been partly or completely performed; provided, however, that the exercise of such authority shall be limited to cases in which in the opinion of the Engineer it is necessary in order to provide for some unforeseen contingency arising in the course of the performance of the Contract, or shall otherwise be in furtherance of and subordinate to the carrying out of the objective of the Contract, and shall not be for the purpose of requiring the performance of new work, unrelated thereto.

When Wildner sought compensation under these provisions for the additional work performed, the OTC paid extra for the additional square footage, but not for removal of the "abnormally thick" existing paint. The OTC claimed that Wildner was responsible for determining how much work would be required to remove the paint before it bid on the contract under § G–2.04 ("Examination of Plans, Specifications, Special Provisions and Site of Work"). Section G–2.04 provides:

The Bidder is required to examine carefully the site of the Work, the Proposal, the Plans and the Specifications, and to read and fully acquaint himself with all other Contract Documents for the work contemplated. The Bidder, in submitting a Proposal, warrants that he has investigated and is acquainted with the conditions to be encountered in performing the Work, including the character, quality and quantities of work to be performed and materials to be furnished, the prevailing hourly wage rates for the area in which the Work is to be performed, and the requirements of the Contract. Submission of a Proposal shall be considered conclusive evidence that the Bidder has sufficient time to make such examination and did make such examinations and knows all conditions which will affect the Work, or has voluntarily assumed all risks incident to his failure to make such examination and obtain such knowledge.

It is the obligation of the Bidder to make his own investigation of subsurface conditions prior to submitting his Proposal. The Bidder may examine at the office of the Commission the records of all borings, test excavations, and other subsurface investigation, if any, made for design purposes of the Commission prior to the construction of the Work, the records of which may or may not be shown on the Plans. Said borings, test excavations, and other subsurface investigations are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claims against the Commission, if in carrying out the Work he finds that the actual conditions encountered do not conform to those indicated by said borings, test excavations and other subsurface investigations.

The OTC did give Wildner an extension of time in which to complete performance, however.

As a condition of being awarded the contract, Wildner was required to deposit $75,760 in escrow with Society National Bank. On September 27, 1994, upon the completion of the project, Wildner requested the release of those funds. The OTC did not release the funds. When Wildner brought the original complaint in this case, the OTC filed a counterclaim for $30,000. Wildner then requested the release of the funds in excess of the $30,000 counterclaim, but the OTC again refused. After an exchange of correspondence, the OTC eventually agreed to the release of the funds in excess of $30,000.

## II.

As an initial matter, the briefing on the OTC's motion to dismiss raised some ques-

tions as to this Court's jurisdiction over the entire dispute. "[F]ederal courts are courts of limited jurisdiction and have a continuing obligation to examine their subject matter jurisdiction throughout the pendency of every matter before them." *Michigan Employment Security Commission v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1137 (6th Cir.1991), *petition for cert. dismissed,* 503 U.S. 978, 112 S.Ct. 1605, 118 L.Ed.2d 317 (1992). Accordingly, although neither party argues that this Court lacks jurisdiction over the entire dispute, this Court will begin by determining whether it has subject matter jurisdiction.

 Wildner brought this complaint pursuant to this Court's diversity jurisdiction. For this Court to exercise diversity jurisdiction, the amount in controversy must exceed $50,000 and the parties must be citizens of different states. 28 U.S.C. § 1332(a)(1). According to the amended complaint, Wildner seeks over $50,000 in damages. Wildner is a citizen of Pennsylvania, where it is incorporated and has its principal place of business. 28 U.S.C. § 1332(c)(1). Similarly, the OTC is a citizen of Ohio, since it was created by the State of Ohio and has its principal place of business in Berea, Ohio.[1] Thus, the requirements for the exercise of diversity jurisdiction are satisfied.

The remaining issue is whether this Court lacks jurisdiction over this suit under Ohio law. The enabling statute for the OTC provides, in pertinent part:

[t]he Ohio Turnpike Commission may do any of the following:

\* \* \* \* \* \*

(4) Sue and be sued in its own name, plead and be impleaded, provided any actions against the commission shall be brought in the court of common pleas of the county in which the principal office of the commission is located, or in the court of common pleas of the county in which the cause of action arose if that county is located within this state.

Ohio Rev.Code § 5537.04(A). The OTC suggests, somewhat half-heartedly, that this language strictly limits the amenability of the OTC to suit, so that it is only subject to suit in the court of common pleas. If so, this Court would be prohibited from exercising jurisdiction over the OTC.

 It is well-settled that states can cloak themselves and the entities they create in sovereign immunity. However, once a state elects to make a state-created entity subject to suit, the entity is subject to the provisions of Article III, § 2 of the United States Constitution and 28 U.S.C. § 1332(a)(1) giving the federal courts jurisdiction over claims between citizens of different states. *Metaljan v. Memphis–Shelby County Airport Auth.,* 752 F.Supp. 834, 837 (W.D.Tenn.1990). The supremacy clause of the United States Constitution prevents the states from overriding those provisions by statute. *Id.* at 836–37 (citing *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Cowles v. Mercer County,* 74 U.S. (7 Wall.) 118, 19 L.Ed. 86 (1869)). Here, Ohio chose to make the OTC liable to suit. It cannot by statute subsequently divest this Court of its diversity jurisdiction over the OTC. Therefore, this Court concludes that the dispute is appropriately before it.

### III.

 Before addressing the merits of the OTC's motion to dismiss, Wildner argues that the motion to dismiss should be denied

---

1. It is true that neither states nor their alter egos are citizens of any state for diversity purposes. *Moor v. County of Alameda,* 411 U.S. 693, 717–18, 93 S.Ct. 1785, 1799–1800, 36 L.Ed.2d 596 (1973); *Ohio Bldg. Authority v. Xerox Corp.,* 819 F.Supp. 696, 697 (S.D.Ohio 1993). However, where an entity is not financially dependent on the state and has an independent existence, it is not an alter ego of the state. *Hess v. Port Authority Trans–Hudson Corp.,* — U.S. ——, ——, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994); *Hutsell*

*v. Sayre,* 5 F.3d 996, 999 (6th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994). The Sixth Circuit long ago concluded that the OTC was not an alter ego of the state, and so is amenable to this Court's jurisdiction. *See Harrison Construction Co. v. Ohio Turnpike Commission,* 272 F.2d 337, 339–41 (6th Cir.1959). Similarly, the eleventh amendment does not bar suits against the OTC. *Id.*

because it was filed one day late. It is certainly within this Court's power to deny the motion as untimely filed. *See* Local Rule 8:8.1. However, this Court is not required to deny the motion simply because it is untimely. In this case, Wildner has identified no prejudice that it has suffered as a result of the untimely filing. Also, failure to consider the motion to dismiss would merely postpone the matter for another day at great expense to the parties, who would have to rebrief the same issues. Both the parties and the Court would be better served if the Court addressed the merits of the OTC's motion. *See* Fed.R.Civ.P. 1.

This Court certainly does not condone the OTC's tardiness and cautions the OTC that continued flaunting of Court-ordered deadlines may result in sanctions or a finding of contempt. In this case, however, the efficient administration of justice requires that the Court consider the merits of the motion, and so the OTC is hereby granted *nunc pro tunc* a one day extension of time in which to file its motion to dismiss.

### IV.

This Court will now turn to the merits of the OTC's motion to dismiss. In ruling on a motion to dismiss, this Court must construe the complaint liberally and accept as true all factual allegations and inferences that may be drawn therefrom. *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir.1994). The motion should only be granted where it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In addition, while the complaint must give the defendant fair notice of what the plaintiff's claim is, it need not set down in detail all the particularities of the claim. *Gazette*, 41 F.3d at 1064 (citations omitted). Wildner's amended complaint has five counts; count II is made up of two alternative causes of action. Each count will be dealt with in turn.

**2.** The parties agree that Ohio law governs this

### A. Breach of Contract

Count I of the amended complaint alleges that the OTC breached its contract with Wildner for failing to compensate Wildner for the extra work Wildner performed and for the resulting delays. Wildner also alleges that the OTC breached its implied covenant of good faith and fair dealing. Finally, Wildner alleges that the OTC breached the contract by withholding the funds held in escrow.

■ It is not disputed that the parties entered into a binding and enforceable contract, or that Wildner has alleged a breach of that contract. However, the OTC asks this Court to dismiss count I as a matter of law. In Ohio,[2] if a contract is clear and unambiguous, its interpretation is a matter of law. *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272 (1984) (per curiam). Thus, if the contract clearly and unambiguously precludes the alleged claim, dismissal is appropriate.

■ The OTC does not point to any provisions in the contract which would bar the claims for breach due to delay, for breach of the implied covenant of good faith and fair dealing, or for breach of the escrow agreement. Therefore, these claims will not be dismissed. The OTC does argue that the extra work claim is precluded by § G–2.04, which puts the responsibility on Wildner for examining the site and acquainting itself with the conditions to be encountered. In addition, § G–2.04 requires Wildner to voluntarily assume the risks incident to its failure to make that investigation.

■ Standing alone, § G–2.04 suggests that Wildner contractually assumed the risk that conditions at the bridge were not as allegedly represented in the contract and that extra work might be necessary. However, § G–2.04 must be read *in pari materia* with the rest of the contract. Other parts of the contract provide for compensation for an increase in the quantity of work and for extra work, which is defined in part as "unforeseen work." *See* §§ G–4.02, G–4.03, and SP 105. If § G–2.04 were read as broadly as the OTC

diversity action.

urges, there could be no compensation for unforeseen work or increases in quantity; the contractor would be charged with having foreseen all the work to be done, or would be held to have assumed the risks of unforeseen work and of an increase in the size of the project. This argument proves too much, for it would render §§ G–4.02, G–4.03, and SP 105 nugatory. It is a fundamental rule of contract interpretation that the Court must give meaning to all of the provisions of the contract. Therefore, § G–2.04 cannot be read as broadly as the OTC urges and it does not preclude Wildner's claim.

■ Next, the OTC argues that the removal of the "abnormally thick" coating could not be extra work because it is required by the contract. The OTC points to § SP 101 which states that the "major work to be performed under the contract includes ... [r]emoval of the existing lead based paint." The OTC concludes that because the removal of paint is included within the work to be performed, it could not be extra work. Once again, this argument proves too much. Section SP 105 of the contract provides that the contractor will be compensated for the removal of additional quantities of hazardous waste, while § G–4.02 provides for compensation for increases in quantity. The OTC's reading of § SP 101 would make these sections meaningless. Therefore, § SP 101 cannot be read so broadly and does not preclude Wildner's claim.

Also unavailing is the OTC's reliance on *S & M Constructors, Inc., v. City of Columbus,* 70 Ohio St.2d 69, 434 N.E.2d 1349 (1982). In that case, the Ohio Supreme Court stated that "[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Id.,* 434 N.E.2d at 1354 (quotation omitted). The OTC argues that Wildner agreed to remove the "existing lead-based paint" for a fixed sum, and so should not be compensated for the unforeseen difficulties encountered. However, in *S & M Constructors,* the court specifically noted that the contract did not have a "changed

conditions" clause. *Id.* 434 N.E.2d at 1352. In this case, however, the contract specifically provides for compensation for unforeseen work and so is distinguishable.

In addition, *S & M Constructors* involved a claim for changed subsurface conditions. *Id.* 434 N.E.2d at 1350–51. The contract in that case had language nearly identical to that in the second paragraph of § G–2.04 of the contract at issue in this case. That language deals with subsurface conditions and clearly provides that the "Contractor agrees that he will make no claim ... if in carrying out the work, he finds that the actual subsurface conditions encountered do not conform to those indicated by said borings, test excavations and other subsurface investigations." *Id.* 434 N.E.2d at 1352; Contract § G–2.04. The court in *S & M Constructors* specifically relied on that language. *Id.* 434 N.E.2d at 1352–53. However, this case does not involve subsurface conditions, so the second paragraph of § G–2.04 does not apply. Instead, the first paragraph of § G–2.04 applies. Unlike the second paragraph, the first paragraph does not explicitly bar a claim for a change in site conditions. The fact that subsurface claims are specifically barred while others are not indicates an intent not to bar other claims.[3]

Finally, the OTC argues that Wildner's claim for breach of contract must fail even under the terms of §§ G–4.02, G–4.03, and SP 105. The OTC maintains that these provisions require extra work to be ordered pursuant to either §§ G–4.02 or G–5.01. The OTC then argues that Wildner does not allege that the extra work was so ordered and that the complaint therefore fails to state a claim.

■ However, Wildner does allege that it was ordered to perform extra work. For example, in paragraph 17 of the amended complaint, Wildner alleges that it sought compensation "for the extra work it was required to perform." Again, in paragraph 28, Wildner alleges that the delay was the result of the "Turnpike Commission's direction to Wildner to perform extra work." Paragraph

3. This line of reasoning is often described by the phrase *"expressio unius est exclusio alterius,"* or

"the expression of one thing implies the exclusion of those not mentioned."

24 of the amended complaint also alleges that Wildner was ordered to perform extra work, albeit more obliquely. It states that Wildner is entitled to payment for extra work under § G–4.03. It also alleges that extra work is that "which is ordered pursuant to Sections G–4.02 or G–5.01." Amended Complaint ¶ 24 (quoting § G–4.03). The obvious logical conclusion from this paragraph is that the extra work was ordered, although it does not say so in as many words. Therefore, the amended complaint does allege that the extra work was ordered.

 The OTC also points out that Wildner does not allege any written orders under § G–4.02 or specific instructions from the engineer under § G–5.01 requiring Wildner to perform extra work. However, the occurrence of a condition precedent does not have to be alleged with particularity; it is enough to aver it generally. Fed.R.Civ.P. 9(c). Moreover, Ohio recognizes the existence of constructive change orders, even where the contract requires written orders. *Valentine Concrete v. Department of Admin. Serv.,* 62 Ohio Misc.2d 591, 609 N.E.2d 623, 629, 635–36 (Ct.Cl.1991); *see also R.J. Au & Son v. N.E. Ohio Reg. Sewer Dist.,* 29 Ohio App.3d 284, 504 N.E.2d 1209, 1216–17 (1986). Thus, even if Wildner's failure to allege specific change orders precluded a claim based on those orders, Wildner could proceed on the theory that it had received constructive change orders from the OTC or the engineer.

In summary, § G–2.04 does not bar Wildner's extra work claim, and Wildner has sufficiently alleged that the extra work was ordered in accordance with §§ G–4.02 and G–5.01. Count I of the amended complaint therefore states a cause of action for breach of contract due to the OTC's failure to compensate Wildner for alleged extra work.

### B. *Misrepresentation/Recision*

#### 1. *Misrepresentation*

 In the first part of count II of its amended complaint, Wildner alleges that the OTC negligently misrepresented to Wildner the quantity of wastes that would be generat-

ed and negligently misrepresented that it would make adjustments to the contract price if the quantity were inaccurate. The Ohio Supreme Court has described the elements of a claim for negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights,* 41 Ohio St.3d 1, 534 N.E.2d 835, 838 (1989) (quotation and citations omitted). In this case, Wildner clearly alleges that the OTC misrepresented the amount of waste and its willingness to pay, that Wildner justifiably relied on those representations, that the OTC failed to exercise reasonable care in representing the amount of waste, that this occurred during the course of a transaction in which the OTC had a pecuniary interest, and that Wildner was damaged thereby. Wildner therefore alleges all the requisite elements.

 Notwithstanding the sufficiency of Wildner's pleading, the claim must be dismissed because, as a matter of law, Wildner could not have justifiably relied on the alleged misrepresentation of the quantity of waste. The contract specifically provides that all estimates are "approximate," § G–2.03, and that "the Contractor is cautioned that the estimates of the quantities of [hazardous and non-hazardous waste] ... are necessarily more speculative than estimates of some other types of work." § SP 105.[4] In a similar case, the Ohio Supreme Court ruled that reliance in the face of such language was unjustified. *Delman,* 534 N.E.2d at 837–38. In *Delman,* the plaintiffs relied on the point-of-sale inspection conducted by the city when they purchased their home. *Id.* The inspection report itself had a dis-

---

**4.** The contract was incorporated by reference into the complaint, so that the contract is not extrinsic material for the purposes of this motion to dismiss.

claimer, stating that the inspection did not guarantee that no violations existed. *Id.*, 534 N.E.2d at 837. The court ruled that the disclaimer negated the plaintiffs' claim that they had justifiably relied on the city's inspection. *Id.* Similarly, the contract language in the current case operates as a disclaimer, putting Wildner on notice that it should not rely on the estimates of the quantity of waste. Thus, under Ohio law, Wildner could not justifiably rely on the estimates as a matter of law, and the claim must be dismissed.[5]

█ Wildner argues that it also justifiably relied upon the OTC's misrepresentation that it would pay extra if the estimate of waste was incorrect. This argument fails for two reasons. First, Wildner does not allege that the OTC acted without reasonable care in representing that it would pay extra if its estimate of the quantity of waste was wrong. Rather, Wildner only alleges that the OTC failed to exercise reasonable care in making its representations as to the quantity of waste. Amended Complaint, ¶ 56.

█ Second, even if Wildner did allege that the OTC had not exercised reasonable care in representing its willingness to pay, the OTC's promise to pay for the extra work would not give rise to a cause of action for negligent misrepresentation. A claim for negligent misrepresentation is based on false information, not a broken promise. *See Delman*, 534 N.E.2d at 838. Wildner alleges that the OTC broke its promise to pay; this gives rise to a claim for breach of contract, *see* Part IV.A., *supra*, but not a claim for negligent misrepresentation.

█ Finally, Wildner argues that it relied on the OTC's representation that the estimate was based on the best available information that existed at the time. However, Wildner's amended complaint completely fails to allege that Wildner justifiably relied on this representation. Thus, Wildner does not allege an essential element of the claim, and this claim must be dismissed.

5. The fact that Wildner alleges that it did justifiably rely is irrelevant; this Court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286,

*2. Recision*

█ In the alternative, count II of the amended complaint requests recision of the contract on the grounds of mutual mistake. In Ohio, a party is entitled to recision where "there is a mutual mistake as to a material part of the contract and where the complaining party is not negligent in failing to discover the mistake." *Reilley v. Richards*, 69 Ohio St.3d 352, 632 N.E.2d 507, 509 (1994). A mistake is material when it is a mistake as to a basic assumption on which the contract was made that has a material effect on the agreed exchange of performances. *Id.* (quotation omitted). The mutual mistake must also frustrate the intent of the parties. *Id.*

█ Here, Wildner alleges that the mistake in the estimate of the quantity of waste is a material mistake requiring recision. While Wildner alleges the necessary legal conclusions, the facts it alleges fail to state a claim. The mistake Wildner alleges (the error in the waste estimate) is not a material mistake as a matter of law. The contract specifically provides for errors in the estimate of the quantity of waste. §§ G–4.02, G–4.03 and SP 105. Thus, such errors must have been within the contemplation of the parties at the time of contracting. In other words, a basic assumption of the contract was that the estimates were approximate and that errors were anticipated, if not expected. Accordingly, the parties intended to, and did, take that into account. The mistake as to quantity could therefore not be a mistake as to a basic assumption that frustrated the parties' intent.

In response, Wildner relies on *Deibel v. Kreiss*, 38 Ohio Law Abs. 587, 50 N.E.2d 1000, 1002 (Ct.App.1943), in which the court ruled that an error as to quantity could provide the grounds for recision due to a material mistake. *Deibel* is easily distinguished from the present case, however. In *Deibel*, the contract at issue was an accord and satisfaction of a lawyer's contingency fee. *Id.*, 50 N.E.2d at 1001. The parties' agree-

106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986). Wildner's allegation that it justifiably relied is a legal conclusion, not a fact.

ment was based on a mistake as to the amount of the recovery; the actual recovery was much greater than anticipated. *Id.,* 50 N.E.2d at 1001–02. In *Deibel,* the parties assumed that the amount of the recovery had been established and did not provide for any errors in their contract. Here, in contrast, the parties specifically provided for errors in quantity. As stated above, a contingency specifically anticipated by the parties cannot be a mistake which frustrates the parties' intention.

In the alternative, Wildner argues that it states a claim for recision based on unilateral mistake. However, this argument runs into the same problem as does the claim for mutual mistake. An alleged mistake which the parties contemplated and for which they provided is simply not material as a matter of law. Therefore, count II of the amended complaint must be dismissed.

### C. *Superior Knowledge*

■ Count III of Wildner's amended complaint is styled as a cause of action for "superior knowledge." Of course, superior knowledge is not a cause of action in and of itself; rather, it is a doctrine which supplies the basis for a claim of breach of contract against the government. *See GAF Corp. v. United States,* 932 F.2d 947, 949 (Fed.Cir. 1991), *cert. denied,* 502 U.S. 1071, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). Under the superior knowledge doctrine, the government can breach a contract by failing to disclose knowledge within its possession. *Id.*

■ The OTC argues that this count should be dismissed because Ohio does not recognize the superior knowledge doctrine. In fact, this Court found no Ohio cases which explicitly use the term "superior knowledge." However, Ohio courts have consistently recognized a cause of action for breach of contract where the government failed to provide necessary information that it had in its possession, or provided inaccurate information.

*See, e.g., Pitt Construction Co. v. City of Alliance,* 12 F.2d 28, 30 (6th Cir.1926); *Valentine Concrete,* 609 N.E.2d at 629; *Condon–Cunningham, Inc. v. Day,* 22 Ohio Misc. 71, 258 N.E.2d 264, 268–69 (C.P.1969). These cases suggest that if the government is in a better position to obtain material information than the contractors, and fails to provide it, or provides inaccurate information, the failure to provide that information may be a breach of contract. *Valentine .Concrete,* 609 N.E.2d at 629 (citing *Pitt Construction,* 12 F.2d 28). In this case, Wildner alleges that the OTC was in a better position to obtain material information regarding the thickness of the bridge coating (or in fact had this information), but failed to obtain it or communicate it to Wildner, knowing that Wildner lacked that information. Under Ohio law, this states a cause of action.

. ■ In response, the OTC argues that this claim is precluded by § G–2.04 of the contract, which requires Wildner to make all necessary investigations of the site and to assume the risks of not doing so. However, all of the Ohio courts which have considered this question have rejected defenses to similar claims based on similar or even identical exculpatory language in contracts. *See Pitt Construction,* 12 F.2d at 30 (similar language); *Condon–Cunningham,* 258 N.E.2d at 268–69 (identical language). Therefore, the exculpatory language of § G–2.04 does not bar this claim.

Finally, the OTC argues that Wildner fails to state a claim for relief for superior knowledge under federal law. *See GAF,* 932 F.2d at 949 (listing elements). This Court need not address this issue, because Wildner's claim is not a claim under federal law. Rather, it is a claim under analogous Ohio law. As a result, the only question is whether Wildner has alleged the requisite elements under Ohio law. As noted above, it has. Therefore, count III of the amended complaint states a cognizable claim and dismissal is not appropriate.[6]

---

**6.** The Court notes that there is an apparent incongruity between the dismissal of count II and the decision not to dismiss count III, since both are premised on the flow of information from the OTC to Wildner. The obvious answer is that the incongruity is in the law of Ohio, which this

Court is bound to follow. For whatever reason, Ohio has chosen to require a finding of justifiable reliance for a claim of negligent misrepresentation, but not for a claim that a government agency failed to provide accurate information regarding a contract. In addition, the bases for

### D. Unjust Enrichment/Quantum Meruit

■■■ Wildner's fourth claim is for unjust enrichment, or *quantum meruit*. In order to maintain a cause of action for unjust enrichment under Ohio law, the plaintiff must allege: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 465 N.E.2d 1298, 1302 (1984) (per curiam) (quotation omitted). Here, Wildner alleges that it conferred the benefit of removing the "abnormally thick" coating from the bridge, and that the OTC has knowingly retained that benefit without paying for it.

■■■ However, in the absence of fraud or bad faith, Ohio law prohibits recovery under a theory of unjust enrichment where an express contract covers the same subject. *Randolph v. New England Mutual Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir.1975); *Ullmann v. May*, 147 Ohio St. 468, 72 N.E.2d 63, Syll. at ¶ 4 (1947). Any fraud or bad faith that negates the operation of this rule must occur in the formation of the contract. *Eyerman v. Mary Kay Cosmetics*, 967 F.2d 213, 222 (6th Cir.1992). Here, it is undisputed that Wildner and the OTC had an express contract pertaining to the same subject, i.e., the stripping and recoating of the bridge. Thus, Wildner must allege fraud or bad faith in the complaint to avoid dismissal.

In response, Wildner argues that the contract covers only the removal of paint of a normal thickness, and does not cover the removal of "abnormally thick" paint. Accordingly, it claims that its claim for unjust enrichment is outside the parameters of the contract and not barred by it. *See Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 544 N.E.2d 920, 924 (1989). However, as discussed above, the contract does cover the extra work. Either it provides for payment, as Wildner argues, or it provides that Wildner is not entitled to payment, as the OTC argues. In either case, it certainly contemplates and covers the issue of additional work. Therefore, the claim for unjust enrichment is not outside the parameters of the contract.

In the alternative, Wildner maintains that it has pled bad faith in the formation of the contract.[7] Wildner points to paragraphs 11–13, 64–67, and 72, in which Wildner alleges that the OTC withheld information it had regarding the thickness of the paint on the bridge from Wildner. While not specifically charging the OTC with bad faith, these paragraphs do allege that the OTC acted in bad faith in the formation of the contract. These allegations, if proved, would provide the basis for a quasi-contractual claim. The amended complaint therefore states a cause of action for unjust enrichment and OTC's motion to dismiss is denied as to count IV.

### E. Conversion

■■■ Count V of the amended complaint alleges that the OTC converted Wildner's property when it failed to authorize the release of the excess escrow funds. Conversion is the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner. *Tabar v. Charlie's Towing Service, Inc.*, 97 Ohio App.3d 423, 646 N.E.2d 1132, 1136 (1994), *appeal not allowed*, 70 Ohio St.3d 1428, 638 N.E.2d 89. To establish a claim for conversion under Ohio law, the plaintiff must demonstrate: (1) he or she demanded the return of the property from the possessor after the possessor exercised dominion or control over it; and (2) the possessor refused to deliver the property to its rightful owner. *Id.* In this case, it is undisputed that Wildner has alleged facts, which, if proved, would establish each of

---

the claims differ somewhat. Negligent misrepresentation is a tort claim based on false information provided by one who may or may not have a duty to provide that information, while superior knowledge is a breach of contract claim based on a duty to provide information. It is not unreasonable to have a higher standard of reliance when the defendant has no duty to provide the information.

7. Fraud must be pled with particularity, Fed. R.Civ.P. 9(b), and Wildner does not claim that it pled fraud.

these elements with regard to the funds in escrow.

In response, the OTC asserts that this Court lacks jurisdiction over count V. The OTC claims that the escrow agreement was entered into pursuant to Ohio Rev.Code §§ 153.13 and 153.63. Ohio Rev.Code § 153.63(C) provides that "[w]hen the public owner ... and the contractor disagree as to the conditions under which money is to be paid under this section, the contractor shall file an action in the court of claims." The OTC argues that this statute provides the sole remedy for public escrow disputes and that this Court therefore lacks jurisdiction.

■ However, as Wildner points out, a different Ohio statute provides that the OTC may only be sued in the courts of common pleas. Ohio Rev.Code § 5537.04(A)(4). This apparent conflict between the statutes was resolved by the Ohio legislature in the creation of the OTC. The enabling statute provides that the OTC "is subject to all provisions of law generally applicable to state agencies *which do not conflict with this chapter.*" Ohio Rev.Code § 5537.02(A) (emphasis added). Since Ohio Rev.Code § 153.63(C) conflicts with § 5537.04(A)(4), the former section does not apply to the OTC. Thus, the court of common pleas has jurisdiction over this dispute. As discussed above, this Court's diversity jurisdiction cannot be defeated by the grant of exclusive jurisdiction over the OTC to the court of common pleas. *See* Part II, *supra.* Thus, this Court has jurisdiction over the escrow dispute.

■ Next, the OTC argues in a footnote that the claim should be dismissed because Ohio does not recognize a conversion claim for a mere breach of contract. *See Frisbie Co. v. City of East Cleveland,* 98 Ohio St. 266, 120 N.E. 309, 312 (1918). While this may be true, that is not the case here. In *Frisbie,* the plaintiff had installed water mains pursuant to what turned out to be an unenforceable contract. *Id.,* 120 N.E. at 309–11. The conversion claim was based solely on the city's failure to pay for the

mains. *Id.,* 120 N.E. at 312. In addition, the court in *Frisbie* held that the plaintiff had failed to establish the essential elements of conversion and had consented to the city's disposition of the property at issue. *Id.*

In the current case, however, Wildner's conversion claim is not based on the OTC's failure to pay; rather, Wildner is arguing that OTC converted the funds in escrow. A search by this Court turned up several Ohio cases in which it was assumed that plaintiffs were able to maintain actions for the conversion of escrow funds, including ones in which the escrow was established pursuant to a contract. *See, e.g., Suveges v. James,* 1995 WL 614980, *1 (Ohio Ct.App.1995) (claim valid but dismissed for lack of jurisdiction); *Parmelee v. 34 South State Street, Inc.,* 1993 WL 407308, *1—*2 (Ohio Ct.App.1993) (dismissed on other grounds); *Hoffman v. Gable,* 1991 WL 260118, *4 (Ohio Ct.App.1991) (summary judgment granted because plaintiff had no interest in escrowed funds), *jurisdictional mot. overruled,* 63 Ohio St.3d 1464, 590 N.E.2d at 757 (1992). Furthermore, unlike the plaintiff in *Frisbie,* Wildner has pled the requisite elements and did not consent to the OTC's alleged conversion. Therefore, count V is properly before the Court and the OTC's motion to dismiss it is denied.

■ In the alternative, the OTC argues that Wildner's claim for punitive damages under count V is barred as a matter of law. Under Ohio law, punitive damages are not available against the state. *Drain v. Kosydar,* 54 Ohio St.2d 49, 374 N.E.2d 1253, 1257 (1978). The state is defined to include the departments, boards, offices, commissions, agencies, institutions, and other instrumentalities of the state. Ohio Rev.Code § 2743.01(A); *Drain,* 374 N.E.2d at 1257. As noted above, the OTC is subject to all provisions of law which do not conflict with its enabling act, and is defined as a commission and as an instrumentality of the state. Ohio Rev.Code § 5537.02(A). Therefore, punitive damages are not available against the OTC, and Wildner's claim for punitive damages is dismissed.[8]

---

**8.** This result may seem incongruous in light of this Court's earlier conclusion that the OTC is

not the state of Ohio and is subject to suit in this Court. However, whether the OTC is subject to

## V.

For the foregoing reasons, this Court concludes that count II of Wildner's amended complaint fails to state a claim for misrepresentation or recision and that the OTC is not subject to punitive damages. However, this Court also concludes that counts I, III, IV, and V do state claims upon which relief can be granted and that this Court has jurisdiction over these claims. Therefore, the OTC's motion to dismiss is granted as to count II and as to Wildner's claim for punitive damages under count V, but denied as to counts I, III, IV, and the remainder of count V.

IT IS SO ORDERED.

suit in this Court is a question of federal law, while whether the OTC is liable for punitive damages is governed by state law. Thus, the differing results are not logically inconsistent.