OPINION
{¶ 1} Plaintiff-appellant, Maghie Savage, Inc. ("MS"), appeals from the Franklin County Court of Common Pleas' judgment on a directed verdict in favor of defendant-appellee, P.J. Dick Inc. ("PJD"), and entry of summary judgment in favor of defendant-appellee, Blakley Corporation ("Blakley"). For the following reasons, we affirm. *Page 2 
 {¶ 2} This action arises out of the construction of the Austin Knowlton School of Architecture (the "project") at The Ohio State University ("OSU"). Construction began in June 2002 and was originally scheduled for completion in April 2004. The completion date for the project was informally extended to June 2004, but the project was not completed until August 2004.
 {¶ 3} The project involved a number of separate prime contracts. PJD was the prime contractor for the general trades work, the lead contractor, and responsible for scheduling all of the contractors' work. PJD entered into subcontracts with MS and Blakley. PJD's subcontract with Blakley (the "Blakley subcontract") encompassed the installation of windows, skylights, curtainwall, and other glass exteriors, and its subcontract with MS (the "subcontract") encompassed the framing, hanging and finishing of drywall, and the installation of ceiling tiles.
 {¶ 4} Article 9 of the subcontract specified the procedures by which MS could assert a claim for additional compensation. Paragraph 9.1.1 provides as follows:
 If Subcontractor's Work is delayed, accelerated, compressed, re-sequenced or if Subcontractor is adversely impacted in any way in the prosecution of the Work due to the schedule, or the acts of Owner and/or its agents, other independent contractors of Owner, Contractor, or Contractor's other subcontractors, and Subcontractor suffers delay, acceleration, compression, loss of efficiency, extended overhead, or any other type of damages, losses or impacts therefrom, or if Subcontractor has any other type of claim for additional compensation to be asserted against Contractor or any of such other entities, Subcontractor agrees to provide written notice within two (2) business days of the event or occurrence giving rise to the impact to Subcontractor's Work, or such claims shall be barred. Time shall be of the essence. *Page 3 
Plaintiff's Exhibit 1. Paragraph 9.1.2 states that "failure to provide timely written notice to Contractor of any * * * adverse impact to Subcontractor's work" will preclude recovery of damages incurred "as a result of any adverse impact to Subcontractor's Work." Paragraph 9.3.1 requires the subcontractor's written notice to include "a brief statement of the impact to Subcontractor's Work, the entity Subcontractor believes to be responsible for the impact to Subcontractor's Work, and any damages known to Subcontractor arising from such additional work or impact."
 {¶ 5} Blakley's installation of windows and skylights was originally scheduled to commence in September 2003, but was rescheduled to November 2003. By January 2004, however, Blakley had not begun installation because the windows had not shipped from the supplier. Upon learning, in late 2003, of Blakley's delay, PJD temporarily enclosed the building with visqueen, a plastic material, and provided temporary heaters from December 2003 through March 2004.
 {¶ 6} MS received a January 2004 start date for its interior work on the project, but, because of environmental conditions, including moisture, standing water, and temperatures below 50 degrees, caused by weather and the absence of windows and skylights, MS was hesitant to commence its drywall work. MS maintains that the conditions in the building were inadequate for drywall installation and that the plastic enclosure and temporary heaters employed by PJD were insufficient to remedy the inadequate conditions. MS notified PJD of its concerns in a series of letters dated between January 5, 2004 and March 23, 2004. A common thread in MS's letters was that it could not warrant the installation performed in inadequate environmental conditions. On January 6, 2004, PJD responded to MS's first letter, stating that "[t]he *Page 4 
completion date of this project dictates that you start installing drywall." Plaintiff's Exhibit 13. As ordered by PJD, MS began work under the subcontract in January 2004 and had completed 85 percent of its drywall work by the end of March 2004. MS's expert witness, Kurt Keidel, testified that MS's work, which included most of the drywall hanging, during the cold and wet weather was performed efficiently.
 {¶ 7} In a letter dated January 14, 2004, Scott Conlon ("Conlon"), the OSU Project Manager, responded to notice from PJD that it was unable to meet the approved construction schedule with respect to Blakley's work. Conlon informed PJD that, "should the other Prime Contractors not be able to complete their work as a result of your inability to meet the schedule, [PJD] will be held responsible for all costs associated with the delays." Plaintiff's Exhibit 53.
 {¶ 8} From January 5, 2004 through October 13, 2004, as a result of Blakley's delay, PJD issued eight change orders to Blakley, deducting various amounts from the Blakley subcontract for weather protection, drywall repair, water damage repairs, acceleration costs, and extended field office overhead. PJD also issued change orders to pay MS for extra work to replace and repair water-damaged portions of its work.
 {¶ 9} In a letter dated October 21, 2004, months after MS completed its work on the project, MS notified PJD that, "[a]s a result of the job conditions [including low temperatures, high moisture, standing water, and ice] our labor escalated for both hanging and finishing drywall." Plaintiff's Exhibit 48. MS requested a change order authorizing additional costs of $248,459. Explaining the basis of MS's claim, Keidel testified that MS suffered labor inefficiencies and lost productivity from April to *Page 5 
June 2004 as a result of acceleration of the project schedule, suboptimal crew size, and overcrowding. James Savage, an owner of MS, testified that MS waited until October 2004 to file a claim for additional costs because those costs could not previously be calculated. Savage explained that, in January 2004, when MS notified PJD about the inadequate environmental conditions, MS did not know the value of the impact those conditions would have on its work. Savage stated that MS did not know whether "the other trades [were] going to be able to get out of our way, there was no possible way to put a price on the future because of the job conditions." (Vol. V Tr. 709.) PJD did not issue a written response to MS's October 2004 claim letter.
 {¶ 10} On March 4, 2005, MS sent a follow-up letter to PJD, reiterating its "claim for lost productivity due to acceleration required to meet schedules delayed by environmental conditions." Plaintiff's Exhibit 54. That letter stated as follows:
 As you are aware, the lack of a completed shell (i.e. windows, roofing) caused the interior environment (lack of adequate temporary heat and presence of [too] much water) to delay the start of the hanging and finishing by 5 weeks. These conditions also contributed to poor production during the interior framing sequences. The additional hours referenced in my earlier letter were worked in a 3-month period and represent a doubling of our planned crew size for both the hanging and finishing work on this project. Many studies are available about the effect of overcrowding on productivity. All agree the loss is profound.
Although MS requested a written response to its claim within two weeks, PJD did not respond.
 {¶ 11} PJD did not pay MS's claim. Barry Bandura, PJD's Senior Project Manager, testified that MS had not given notice of the basis of its claim, as required by the subcontract, and did not offer any proof in support of its claim. Bandura testified *Page 6 
that Randy Young, MS's project manager, was in constant communication with PJD, but had not mentioned labor inefficiencies prior to the October 2004 letter.
 {¶ 12} On August 17, 2005, Blakley filed an action against PJD in the Franklin County Court of Common Pleas, alleging a breach of contract and seeking to recover its subcontract balance and compensation for additional work. See Blakley Corp. v. P.J. Dick, Inc., Franklin C.P. No. 05CVH08-8947. MS filed this action against PJD and Blakley on December 28, 2005. Seeking recovery for additional costs due to labor inefficiency and loss of productivity, MS alleged claims against PJD for breach of contract, negligence, breach of express and implied warranties, and punitive damages. MS also alleged claims against Blakley as a third-party beneficiary to the Blakley subcontract and for punitive damages. With the parties' agreement, the trial court consolidated MS and Blakely's actions.
 {¶ 13} Upon motion, the trial court dismissed MS's claims for negligence and punitive damages. Additionally, as a result of a settlement agreement between PJD and Blakley, those parties dismissed with prejudice all claims, counterclaims, and cross-claims against each other.
 {¶ 14} On June 7, 2007, Blakley filed a motion for summary judgment on MS's third-party beneficiary claim, and, on July 10, 2007, PJD filed a motion for summary judgment on MS's claims for breach of contract, breach of warranties, and unjust enrichment. In its motion, PJD argued that MS's breach of contract claim was barred due to MS's noncompliance with the subcontract's notice requirements and that MS's unjust enrichment claim was barred because the subcontract governed the subject of that claim, thus precluding an action for unjust enrichment. *Page 7 
 {¶ 15} On December 28, 2007, the trial court granted Blakley's motion for summary judgment and granted PJD's motion for summary judgment as to MS's breach of warranties claim. The trial court denied PJD's motion for summary judgment as to MS's breach of contract and unjust enrichment claims, however. With respect to the breach of contract claim, the court warned MS as follows:
 [I]f it should turn out that there were no further communications from MS to [PJD] during the relevant period, or at least none that identify, in some terms, labor inefficiency as an impact on MS, then it would appear that MS did not satisfy its obligation [under the subcontract] to give written notice within two business days of the event or occurrence giving rise to the impact to [MS's] work that includes "a brief statement of the impact to Subcontractor's Work."
(Emphasis sic.) As a result of the trial court's rulings and the stipulated dismissal, the only claims left pending for trial were MS's breach of contract and unjust enrichment claims against PJD.
 {¶ 16} A nine-day jury trial commenced on February 11, 2008. As on summary judgment, a predominant issue at trial was whether MS was required to comply, and whether it did, in fact, comply, with the notice requirements in the subcontract. At the conclusion of MS's case, PJD moved for a directed verdict. The trial court took PJD's motion under consideration, but allowed the trial to continue. Before submitting the case to the jury, the trial court granted PJD's motion for a directed verdict on MS's unjust enrichment claim, but again reserved ruling on PJD's motion with respect to the breach of contract claim.
 {¶ 17} The trial court submitted MS's breach of contract claim to the jury, and the jury returned a verdict in favor of MS, awarding damages of $62,567.96. The jury *Page 8 
affirmatively answered an interrogatory that asked, "did six or more of you find that [MS] satisfied or [PJD] waived the written notice requirement for claims on which you were instructed."
 {¶ 18} Despite the jury verdict, the trial court subsequently granted PJD's motion for a directed verdict on MS's breach of contract claim. The court stated that the record at the close of MS's case contained no evidence that MS provided PJD with contractually required, written notice of its claim. MS moved the trial court to set aside the directed verdict and to reinstate the jury verdict, but the trial court denied that motion. In addition to reiterating that the record lacked evidence that MS satisfied the notice requirements, the court also stated that MS cited no evidence in the record to support a finding that PJD waived the notice requirements. The trial court entered final judgment in favor of PJD on May 12, 2008.
 {¶ 19} MS appeals, asserting the following assignments of error:
 1. The lower court erred in granting a directed verdict for [PJD] following the jury verdict in favor of [MS] in this matter.
 2. The lower court erred in granting a directed verdict for [PJD] premised upon a legal standard other than set forth in the jury instructions not objected to by [PJD].
 3. The lower court erred in dismissing [Blakley] as a defendant in the lawsuit initiated by [MS].
 4. The lower court misconstrued the contract in granting a directed verdict to [PJD] when it misconstrued the term "impact."
 5. The lower court misconstrued the contract in granting a summary judgment to [Blakley] when it ruled [MS] was not a "third party [beneficiary]" under the "HEIRS" clause. *Page 9 
 6. The lower court erred in failing to permit introduction of the terms of the settlement agreement between [Blakley] and [PJD].
 7. The lower court erred in precluding evidence as to the change orders issued to the prime contractors by the owner, [OSU], due to delays.
 8. The lower court erred in granting a directed verdict on the count of unjust enrichment, when that claim went to activities outside of the contract.
For ease of discussion, we divide MS's assignments of error into three groups. First, we will address the four assignments of error stemming from the directed verdict. Second, we will address the two assignments of error stemming from the summary judgment on MS's third-party beneficiary claim. Finally, we will address the two assignments of error concerning evidentiary issues.
 {¶ 20} MS's first, second, fourth, and eighth assignments of error arise from the directed verdict on MS's claims for breach of contract and unjust enrichment. Pursuant to Civ. R. 50(A)(4), a trial court must grant a motion for a directed verdict if, after construing the evidence most strongly in favor of the non-moving party, it concludes that "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [the non-moving] party." SeeGroob v. KeyBank, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14. "A motion for directed verdict tests whether the evidence is sufficient to warrant a jury's consideration, so * * * a trial court considers neither the weight of the evidence nor the credibility of the witnesses."Jarupan v. Hanna, 10th Dist. No. 06AP-1069, 2007-Ohio-5081, ¶ 8, citingEstate of Cowling v. Estate of Cowling, 109 Ohio St.3d 276,2006-Ohio-2418, ¶ 31, and Wagner v. Roche Laboratories,77 Ohio St.3d 116, 119, 1996-Ohio-85. The court's singular *Page 10 
concern is whether the non-moving party adduced substantial competent evidence in support of each element of his or her claim. Id. A directed verdict presents a question of law that an appellate court reviews de novo. Groob, at ¶ 14.
 {¶ 21} The trial court directed a verdict on MS's breach of contract claim based on its finding that the record lacked evidence that MS gave PJD contractually required, written notice of its claim or that PJD waived compliance with the subcontract's notice requirements. There is no dispute that the subcontract's notice requirements, as set forth in Article 9, apply to MS's claims, but the parties dispute what those sections require and whether MS complied or was excused from complying. MS makes several arguments in support of its contention that the trial court erred by directing a verdict on its breach of contract claim, including the following: (1) a directed verdict is contrary to the jury instructions; (2) the trial court misread the subcontract's notice requirements; (3) the record contained evidence that MS satisfied the notice requirements; (4) the record contained evidence that PJD waived the notice requirements; and (5) MS was excused from complying with the notice requirements as a result of PJD's alleged breach of the subcontract by ordering MS to perform in adverse weather conditions.
 {¶ 22} We reject MS's argument that entry of a directed verdict is contrary to, and precluded by, the trial court's jury instructions, which included the following:
 Under the terms of the [subcontract], * * * [MS] is required to prove that it provided written notice within two business days of the event or occurrence giving rise to its claims, or such claims are barred. [MS] must prove that such written notice included a brief statement of the impact, who [MS] believed to be responsible for the impact, and any damages known to [MS] arising therefrom. Accordingly, for each and every item included in its loss of efficiency or productivity *Page 11 
claim and other claims [MS] must show by a preponderance of the evidence that it provided the written notice required by the contract. Unless [MS] can prove that [PJD] waived such notice requirement, failure to provide such notice constitutes a waiver of [MS's] claims.
 * * *
 If you find that [MS] did not provide written notice of the claims at issue, including its loss of efficiency claim, within two business days, and that [PJD] did not waive the contractual requirement of such notice, then you must find in favor of [PJD].
(Vol. VI Tr. 1000-02.) Based on the principle that a court should generally give a requested jury instruction if it is a correct statement of the law and reasonable minds might reach the conclusion sought by the instruction, see Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591, MS contends that the instruction on notice and waiver constitutes a determination that the record contained sufficient evidence from which reasonable minds could conclude that MS satisfied the notice requirements or that PJD waived those requirements. MS maintains that, by giving the jury instruction, the court made a finding contrary to that required for a directed verdict.
 {¶ 23} This court has previously held that the provisions of Civ. R. 50 are consistent with a trial court's discretion to reserve ruling on a motion for a directed verdict until after the jury has returned a verdict. Crawford v. By Lamb Builders, Inc. (Aug. 10, 1993), 10th Dist. No. 93AP-282. We stated that that procedure promotes judicial economy because, if an appellate court reverses the ruling on the motion for a directed verdict, the jury verdict can be reinstated. To the extent that a court may reserve ruling on a motion for a directed verdict until after a jury returns its verdict, we must reject MS's argument here. By its nature, the necessary finding underlying a *Page 12 
directed verdict will conflict with the jury instructions when the trial court submits the case to a jury. The relevant question with respect to a motion for a directed verdict is whether there is sufficient evidence to warrant a jury's consideration, and the giving of an instruction and submission of the case to a jury does not create evidence where there is none.
 {¶ 24} MS next argues that the trial court directed a verdict based on its misreading of the subcontract. Specifically, MS argues that the subcontract did not require written notice identifying the type of impact that MS suffered. MS proposes, instead, that impact is implied, and that, while the subcontract requires notice that there has been an impact, it does not require identification of that impact. Contrary to MS's proposition, Paragraph 9.3.1 unambiguously defines the contents of the written notice required when the subcontractor asserts a claim based on time impact and requires that the written notice include "a brief statement of the impact to [the subcontractor's] Work." MS's construction of the subcontract would render Paragraph 9.3.1 meaningless, in violation of established principles of contract interpretation. See Foster Wheeler Enviresponse, Inc. v. Franklin Cty.Convention Facilities Auth., 78 Ohio St.3d 353, 363, 1997-Ohio-202 (a court must "attempt to give effect to each and every part of [a contract] * * * and avoid any interpretation of one part which will annul another part").[1] Accordingly, we reject MS's argument that the trial court's directed verdict is the result of an erroneous reading of the subcontract. *Page 13 
 {¶ 25} MS next argues that the record contained evidence from which reasonable minds could conclude that MS satisfied the subcontract's notice requirements. Upon review, we agree with the trial court that the record lacked evidence that MS complied with the notice requirements, as set forth in Paragraphs 9.1.1 and 9.3.1. Young was aware that MS would be affected as a result of performing in adverse weather conditions between January and March 2004, but his October 21, 2004 letter was the first to PJD identifying the impact on MS's work. Young admitted that none of his earlier letters to PJD mentioned labor inefficiencies or loss of productivity. Thus, those letters did not constitute notice of MS's claims based on labor inefficiencies or loss of productivity, as required by the subcontract.
 {¶ 26} Keidel testified that MS was not claiming a loss of efficiency or productivity during the cold weather period, from January to March 2004, but, rather, from April to June 2004, when the work schedule was accelerated to compensate for the earlier delays. In fact, Keidel testified that MS hung most of the drywall prior to April 2004 and that MS performed that work efficiently. According to Keidel, MS's alleged labor inefficiencies and loss of productivity resulted from overcrowded conditions, including different trade contractors working at the same time, and suboptimal crew sizes. During April, May, and June 2004, while MS was allegedly experiencing labor inefficiencies and loss of productivity, MS presented no written notice to PJD of that impact. Bandura testified that, prior to the October 21, 2004 letter, he had no discussions or correspondence with MS about labor inefficiencies or lost productivity. Accordingly, we find no error in the trial court's conclusion that the record lacked evidence that MS provided timely written notice of its claim for damages *Page 14 
resulting from labor inefficiencies or loss of productivity during April, May, and June 2004.
 {¶ 27} We next consider whether the record contained evidence from which reasonable minds could conclude that PJD waived the subcontract's notice requirements or that MS was otherwise excused from complying with those requirements. "Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional."Glidden Co. v. Lumbermens Mut. Cas. Co., 112 Ohio St.3d 470,2006-Ohio-6553, ¶ 49. A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive. City of N. Olmsted v. Eliza Jennings,Inc. (1993), 91 Ohio App.3d 173, 180, citing White Co. v. Canton Transp.Co. (1936), 131 Ohio St. 190, 198-99. Silence does not amount to waiver where a party is not under a duty to speak. N. Olmsted, at 180. While there is no dispute that PJD could have waived the subcontract's notice requirements, PJD maintains that the record contained no evidence of a clear, unequivocal, decisive act from which reasonable minds could conclude that it intended to do so. We agree.
 {¶ 28} MS bases its waiver argument on the contention that PJD told it to file a claim for additional compensation and did not respond to MS's claim letters in October 2004 and March 2005. At oral argument, MS's counsel directed this court to testimony regarding a lunch meeting between Savage and Bandura in the fall of 2004. Bandura testified about that meeting, as follows:
 [Savage] explained to me that he got killed on this job, and we were kind of both — I explained to him we also got killed. He was looking for money, he was looking for help. I said: ["]Jim, no one is going to write you a check just because *Page 15 
you're a nice guy. You helped us, you did a good job, but I can't just write you a check. You have to give me something I can work with. There [are] provisions in the contract that deal with these type of situations, and that's the way you will have to proceed[,"] and that was the extent of it.
(Vol. V Tr. 799.) Young also testified that Bandura requested that MS submit a claim, and that Bandura's request precipitated the October 21, 2004 claim letter. Even viewing the evidence in the light most favorable to MS, reasonable minds could not conclude that Bandura's statements constitute clear and unequivocal acts demonstrating PJD's intent to waive the contractual notice requirements. Rather, the evidence simply demonstrates that PJD referred MS to the contractual procedures for asserting claims for additional compensation. Furthermore, PJD's failure to issue written responses to MS's claim letters will not be construed as a waiver where, as here, the subcontract imposed no affirmative duty upon PJD to respond to MS's claims in writing.
 {¶ 29} MS also argues that PJD waived the subcontract's notice requirements because it breached the subcontract by ordering MS to perform in adverse weather conditions. We disagree. MS agreed to perform "in full accordance with the Contract between the Owner [OSU] and the Contractor [PJD], the plans, drawings, schedules, specifications and contract documents as included in Contractor's Contract with the Owner," collectively the "Contract Documents," all of which were incorporated by reference into the subcontract. Plaintiff's Exhibit 1, at ¶ 1.1. The project specifications relating to MS's drywall work required that the work "[c]omply with ASTM C 840 requirements or gypsum board manufacturer's written recommendations, whichever are more stringent." Plaintiff's Exhibit 11. Young explained that those requirements mandate a temperature above 50 degrees and dry conditions to install drywall. MS's *Page 16 
obligation to comply with the environmental conditions incorporated into the project specifications was a performance obligation toward PJD, which PJD waived when it undisputedly ordered MS to perform during adverse weather conditions and chose to pay MS for extra work as a result of damage due to the weather in an attempt to minimize delay on the project. Where facts are undisputed, the determination of whether conduct constitutes a breach of contract is a question of law.Corna/Kokosing Constr. Co. v. South-Western City School Dist. Bd. ofEdn., 10th Dist. No. 02AP-624, 2002-Ohio-7028, ¶ 12, citing Luntz v.Stern (1939), 135 Ohio St. 225, paragraph five of the syllabus. Thus, the question of whether PJD breached the subcontract by ordering MS to perform during adverse weather conditions was a question of law. By finding no evidence that MS was relieved of its contractual notice obligations, the trial court at least implicitly found that PJD did not breach the subcontract, and we discern no error in that conclusion.
 {¶ 30} While MS also asserts that waiver of a contractual term does not require evidence of a clear and unequivocal act in the context of construction contracting, the cases that MS cites for that proposition do not involve questions of waiver or are easily distinguishable. For example, in Cleveland Constr, Inc. v. Ohio Public Emp. RetirementSys., 10th Dist. No. 07AP-574, 2008-Ohio-1630, where the trial court determined that the question of whether the plaintiff was contractually obligated to request an extension of time was a factual question, the issue was not whether the notice requirement had been waived, but whether that requirement applied to the plaintiff's claim at all. See also Dugan Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.,113 Ohio St.3d 226, 2007-Ohio-1687, ¶ 41 ("[W]e reject Dugan Meyers's argument that it was excused *Page 17 
from complying with the specific change-order procedure for requesting extensions because the state had actual notice of the need for changes to the deadline, and therefore any failure to comply with procedure was harmless error. The record lacks evidence of either an affirmative or implied waiver by the department or OSU of the change-order procedures contained in the contract.").
 {¶ 31} Lastly, Roger J. Au Son, Inc. v. Northeast Ohio RegionalSewer Dist. (1986), 29 Ohio App.3d 284, in which the Seventh District Court of Appeals held that a contractor's claims were not barred, as a matter of law, for lack of required written notice, is also distinguishable. The contract in that case required the contractor to promptly notify the owner in writing of differing construction site conditions, but permitted the contractor to specify the exact nature of its claims and to seek adjustment of the contract price any time prior to final payment. The court stated, "[t]here is no reason to deny the claims for lack of written notice if [the owner] was aware of differing soil conditions throughout the job and had a proper opportunity to investigate and act on its knowledge, as the purpose of the formal notice would thereby have been fulfilled." Id. at 292. Unlike the contract in Roger J. Au, the subcontract here required notice specifically targeted to the subcontractor's claim, including notice of the event or occurrence impacting MS's work, a brief statement of the impact, the entity responsible, and any known damages. Moreover, as stated above, the record here contains no evidence that PJD had notice of MS's labor inefficiencies or loss of productivity prior to October 2004.
 {¶ 32} For all these reasons, we conclude that the trial court did not err in granting a directed verdict in favor of PJD on MS's breach of contract claim. We now *Page 18 
turn our attention to the trial court's directed verdict on MS's unjust enrichment claim, which is the subject of MS's eighth assignment of error.
 {¶ 33} Unjust enrichment, like quantum meruit, is a doctrine derived from the natural law of equity, and the essential elements of both are the same. U.S. Health Practices, Inc. v. Byron Blake, M.D., Inc. (Mar. 22, 2001), 10th Dist. No. 00AP-1002, citing Loyer v. Loyer (Aug. 16, 1996), 6th Dist. No. H-95-068. A plaintiff must establish the following three elements to prove unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183. In the absence of bad faith or fraud, an equitable action for unjust enrichment will not lie when the subject of the claim is governed by an express contract. Kucan v. Gen. Am. Life Ins. Co., 10th Dist. No. 01AP-1099, 2002-Ohio-4290, ¶ 39, citing Rumpke v. Acme Sheet Roofing, Inc. (Nov. 12, 1999), 2d Dist. No. 17654.
 {¶ 34} The trial court directed a verdict in favor of PJD on MS's unjust enrichment claim based on its finding that the subcontract precluded a claim for unjust enrichment. MS now argues that, because PJD demanded that MS install drywall under conditions contrary to the project specifications, the work upon which it bases its unjust enrichment claim was outside the scope of the subcontract. In AlliedErecting Dismantling Co., Inc. v. Uneco Realty Co.,146 Ohio App.3d 136, 2001-Ohio-3387, the court held that an equitable claim is only precluded by the existence of a contract where the basis for the equitable claim is within the scope of the contract, but that case is factually distinguishable. The parties in Allied Erecting included a primary contractor on *Page 19 
an Ohio Department of Transportation ("ODOT") project, a subcontractor, and the subcontractor's exclusive dirt supplier. When supplied dirt did not meet ODOT specifications, the dirt supplier incurred additional expenses for site work that it was requested to perform. The dirt supplier asserted an unjust enrichment claim against the prime contractor, with whom it had no contract and no contractual privity. The appellate court concluded that the prime contractor was not entitled to a directed verdict on the dirt supplier's unjust enrichment claim, in part, because there was testimony that the extra work performed by the dirt supplier was not within the scope of any of the parties' contractual obligations.
 {¶ 35} In contrast, MS bases its unjust enrichment claim on work expressly contemplated in the subcontract. Specifically, MS alleged in its unjust enrichment claim that it "provided labor and materials to [PJD] in weather conditions adverse to installation of drywall and ceiling tile to enable [PJD] to meet its contractual time obligations." The installation of drywall and ceiling tile was clearly within the scope of MS's subcontract, and the conditions in which it performed that work are irrelevant. Additionally, the subcontract provided a mechanism for MS to assert claims for labor inefficiencies and additional costs. Accordingly, we conclude that MS was not entitled to maintain a claim for unjust enrichment because its express contract with PJD governed the subject of that claim, and the trial court did not err in directing a verdict in favor of PJD on that claim.
 {¶ 36} For these reasons, we overrule MS's first, second, fourth, and eighth assignments of error. *Page 20 
 {¶ 37} MS's third and fifth assignments of error arise out of the trial court's grant of summary judgment in favor of Blakley on MS's third-party beneficiary claim. In its complaint, MS alleged that it was a direct and intended beneficiary of the Blakley subcontract and that it is entitled to recover for damages incurrred as a result of Blakley's failure to perform in a timely manner. Blakley moved for summary judgment, arguing that the Blakley subcontract expressly stated the parties' intention to create no intended third-party beneficiaries. The trial court agreed, finding that Paragraph 19.1 of the Blakley subcontract eliminated any implication that MS was an intended third-party beneficiary. MS argues that the trial court based its summary judgment on an incorrect construction of the Blakley subcontract.
 {¶ 38} We review a summary judgment de novo. Koos v. Cent. OhioCellular, Inc. (1994), 94 Ohio App.3d 579, 588, citing Brown v. SciotoCty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107; Brown, at 711. We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it.Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 41-42.
 {¶ 39} Pursuant to Civ. R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is *Page 21 
entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v.Reynoldsburg, 65 Ohio St.3d 356, 358-59, 1992-Ohio-95, quotingNorris v. Ohio Std. Oil Co. (1982), 70 Ohio St.2d 1, 2.
 {¶ 40} Under Ohio law, only a party to a contract or an intended third-party beneficiary may bring an action on the contract. GrantThornton v. Windsor House, Inc. (1991), 57 Ohio St.3d 158, 161, citingVisintine Co. v. New York, Chicago St. Louis R. Co. (1959),169 Ohio St. 505. "A third party beneficiary is one for whose benefit a promise has been made in a contract but who is not a party to the contract."Chitlik v. Allstate Ins. Co. (1973), 34 Ohio App.2d 193, 196. Whereas an intended third-party beneficiary has enforceable rights under a contract, an incidental third-party beneficiary does not. Hill v.Sonitrol of Southwestern Ohio, Inc. (1988), 36 Ohio St.3d 36, 40. Because MS was not a party to the Blakley subcontract, it must establish that it was an intended third-party beneficiary to maintain its claim.
 {¶ 41} For a third party to be an intended beneficiary of a contract, the contracting parties must enter into the contract with the intent to benefit the third party. Doe v. Adkins (1996), 110 Ohio App.3d 427, 436. In Hill, the Supreme Court of Ohio *Page 22 
adopted the Restatement (Second) of Contracts (1981), 439-40, Section 302, regarding intended and incidental beneficiaries. That section states as follows:
 (1 Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
 (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
 (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
 (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
To find that a third party is an intended beneficiary, "there must be evidence, on the part of the promisee, that he intended to directly benefit [the] third party, and not simply that some incidental benefit was conferred on an unrelated party by the promisee's actions under the contract. There must be evidence that the promisee assumed a duty to the third party." TRINOVA Corp. v. Pilkington Bros., P.L.C. (1994),70 Ohio St.3d 271, 278.
 {¶ 42} The construction of a written contract is a matter of law for the court. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. The primary goal in contract construction is to give effect to the intentions of the contracting parties, and that intent is presumed to reside in the contractual language. Kelly v. Med.Life Ins. Co. (1987), 31 Ohio St.3d 130, 132. When contract terms are clear and unambiguous, a court need not go beyond the plain language of the contract to determine the parties' rights and obligations. EFAAssoc, Inc. v. Dept. of Adm. Servs., 10th Dist. No. 01AP-1001, 2002-Ohio-2421, ¶ 31. *Page 23 
 {¶ 43} Article 19 of the Blakley subcontract, entitled "HEIRS, SUCCESSORS," includes Paragraph 19.1, which states that "[t]his Subcontract shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors, and permitted assigns of the parties hereto, but no third party benefits are createdby this Contract." Plaintiff's Exhibit 84. (Emphasis added.) While the trial court relied on this paragraph to conclude that MS was not an intended third-party beneficiary, MS argues that Paragraph 19.1 is irrelevant to its status as an intended third-party beneficiary because it deals only with benefits to heirs and successors. We disagree. Although Paragraph 19.1 does provide that the rights and obligations under the Blakley subcontract extend to the parties' heirs, executors, administrators, and permitted assigns, it goes on to disclaim the intent to benefit other third parties. Thus, the language of Paragraph 19.1 belies MS's contention, directly impacts the question of whether Blakley and PJD intended to directly benefit MS, and indicates that Blakley did not intend to assume a duty toward MS.
 {¶ 44} Other Ohio courts have given effect to contract clauses disclaiming an intent to create third-party beneficiaries. For example, in CMC Elec. Co., Inc. v. J.D. Williamson Constr. Co., Inc. (Nov. 5, 1999), 11th Dist. No. 98-A-0076, the court affirmed a summary judgment, rejecting a third-party beneficiary claim where the contract stated that duties and responsibilities under the contract were for the exclusive benefit of the contracting parties and not for the benefit of any other party. See also Matheny v. Ohio Bancorp (Dec. 30, 1994), 11th Dist. No. 94-T-5022; Hogan v. Davidson, 8th Dist. No. 91106, 2008-Ohio-4711, ¶ 16.
PGPage 24
 {¶ 45} Despite Paragraph 19.1 of the Blakley subcontract, MS maintains that PJD expressly permitted it to maintain a direct claim against other subcontractors, like Blakley, through Paragraph 9.2.2 of its own subcontract. That section provides as follows:
 As to any claims other than claims against the Contractor for its affirmative acts, errors or omissions, Subcontractor agrees that for all claims arising under Articles 9.1 and 9.2, including claims for deficient design, Contractor under this Article merely acts as a conduit to provide Subcontractor with contractual privity for access to Owner, other contractors, or any other entity to seek reimbursement for damages incurred for such delays or other claims impacting Subcontractor's Work.
To determine whether MS is an intended third-party beneficiary under the Blakley subcontract, a court must ask whether Blakley and PJD intended to directly benefit MS by their performance, and we must glean any such intent from the Blakley subcontract. Accordingly, Paragraph 9.2.2 of MS's subcontract is irrelevant to MS's status as a third-party beneficiary under the Blakley subcontract. While the Blakley subcontract contains an identical Paragraph 9.2.2, that paragraph relates only to Blakley's own claims and not to claims against Blakley. Further, neither Paragraph 9.2.2 demonstrates an intent that MS be entitled to maintain a claim against Blakley when read in concert with Paragraph 19.1 of the Blakley subcontract.
 {¶ 46} Ultimately, we agree with the trial court that Paragraph 19.1 of the Blakley subcontract shows that PJD and Blakley did not intend to directly benefit MS. Indeed, that section unambiguously rejects an intention to extend benefits under the subcontract to unidentified third parties, such as MS. If the language of a contract is clear and unambiguous, courts must enforce the instrument as written. Hybud Equip.Corp. v. *Page 25 Sphere Drake Ins. Co., Ltd. (1992), 64 Ohio St.3d 657, 665. Accordingly, we discern no error in the trial court's grant of summary judgment in favor of Blakley on MS's third-party beneficiary claim, and we overrule MS's third and fifth assignments of error.
 {¶ 47} Finally, MS's sixth and seventh assignments of error assert that the trial court erred by excluding evidence of the settlement agreement between Blakley and PJD and of change orders that OSU issued to other prime contractors as a result of delay. We review rulings regarding the admission or exclusion of evidence under an abuse of discretion standard. Barnett v. Sexten, 10th Dist. No. 05AP-871,2006-Ohio-2271, ¶ 5, citing Dunkelberger v. Hay, 10th Dist. No. 04AP-773, 2005-Ohio-3102. An "abuse of discretion" involves more than an error of law or judgment and implies that the court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, citing State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 48} By its sixth assignment of error, MS contends that the trial court erred by prohibiting the introduction of the settlement agreement between PJD and Blakley. MS specifically argues that the jury was entitled to know of PJD and Blakley's agreement regarding apportionment of liability for any judgment in favor of MS. PJD moved the trial court for an order in limine, excluding evidence of its settlement agreement with Blakley, and MS filed a memorandum in opposition, but the trial court did not rule on PJD's motion.
 {¶ 49} On the first day of trial, PJD's counsel represented to the trial court that, as to the motion in limine regarding the settlement agreement, the parties "have come to a consensus and agreement that we'll tie in the indemnity agreement that is in the *Page 26 
contract between [PJD] and Blakley and have it as part of the charge in this particular proceeding." (Vol. I Tr. 29.) Prior to the conclusion of PJD's case, PJD's counsel confirmed that the parties were in agreement that there would be a stipulation addressing PJD's motion to exclude the settlement agreement. Ultimately, the jury instructions informed the jury that, under paragraph 7.2 of the Blakley subcontract, PJD "may seek to recover from Blakley to the extent of any acts, omissions, or conduct of Blakley which result in [PJD] having liability to a third party (such as [MS]), but only to the extent permitted by that paragraph." (Vol. VI Tr. 999.)
 {¶ 50} Even had the trial court granted PJD's motion in limine, MS did not proffer the settlement agreement at trial. "At trial[,] it is incumbent upon a [party], who has been temporarily restricted from introducing evidence by virtue of a motion in limine, to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." State v.Grubb (1986), 28 Ohio St.3d 199, paragraph two of the syllabus. An appellate court need not review a decision on a motion in limine unless the claimed error is preserved by a proffer when the issue is reached and the context developed at trial. Id. at 203, citing Palmer, Ohio Rules of Evidence Rules Manual (1984) 446. Failure to make a proffer constitutes a waiver of the right to object to the evidentiary issue on appeal. Grubb, at 203. Because the trial court did not grant PJD's motion in limine and, more importantly, because MS did not proffer the settlement agreement as evidence at trial, the admissibility of the settlement agreement is not properly before this court. Accordingly, we overrule MS's sixth assignment of error. *Page 27 
 {¶ 51} By its seventh assignment of error, MS contends that the trial court erred in excluding evidence as to change orders that OSU issued to prime contractors other than PJD due to delay. The trial court issued an order in limine at trial, precluding evidence of those claims and of the settlement of those claims, based on relevancy. MS argues that the other claims establish PJD's motivation to rush completion of the project and to rush MS's work because PJD was potentially liable for the other prime contractors' claims to OSU. During Conlon's testimony, MS's counsel proffered a series of claim letters and a change order, stating that he intended to question Conlon about other prime contractors' claims, the bases for those claims, and payment of those claims. MS argues that the jury was entitled to know of PJD's potential liability for its use in contemplating the amount of any claim by MS. PJD responds that there is no relationship between the other claims and MS's claims against PJD in this case.
 {¶ 52} The introduction of the specific claims of other prime contractors was not necessary to demonstrate that PJD was under pressure to complete the project or that PJD faced potential liability for delay claims by other prime contractors. Despite excluding evidence of specific claims, the trial court permitted MS to introduce evidence indicating PJD's potential liability for the payment of other contractors' claims. Specifically, the trial court permitted admission, without objection, of Conlon's January 14, 2004 letter, which warned PJD that "should the other Prime Contractors not be able to complete their work as a result of your inability to meet the schedule, [PJD] will be held responsible for all costs associated with the delays." Additionally, there was testimony that PJD was under pressure to complete the project because of its potential liability for liquidated damages of $3,000 per day. Upon review, we conclude that the *Page 28 
trial court did not abuse its discretion in excluding evidence of the specific claims of other prime contractors. Accordingly, we overrule MS's seventh assignment of error.
 {¶ 53} In conclusion, we overrule each of MS's assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
BRYANT and KLATT, JJ., concur.
[1] We also note that MS did not object to the jury instruction that MS must prove that its written notice included a brief statement of the impact. Failure to object to a jury instruction generally results in the waiver of the issue on appeal. Dalicandro v. Morrison Rd. Dev. Co.,Inc. (Apr. 17, 2001), 10th Dist. No. 00AP-619, citing Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, 121, and Civ. R. 51(A). *Page 1