[Cite as *LHPT Columbus, L.L.C. v. Capitol City Cardiology, Inc.*, 2014-Ohio-5247.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| LHPT Columbus The, LLC, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 14AP-264 |
| | | (C.P.C. No. 11CV-5913) |
| Capitol City Cardiology, Inc. et al., | : | |
| Defendants-Appellants, | : | (REGULAR CALENDAR) |
| Cap Cit, Ltd. et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on November 25, 2014

*Squire Patton Boggs (US) LLP, Aneca E. Lasley, Aaron T. Brogdon* and *Larisa M. Vaysman*, for plaintiff-appellee.

*Luper Neidenthal & Logan, A Legal Professional Association, Gregory H. Melick* and *Matthew T. Anderson*, for appellants.

APPEAL from the Franklin County Court of Common Pleas

O'GRADY, J.

{¶ 1} Defendant-appellant, NSP Holdings, LLC ("NSP"),[1] appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, LHPT Columbus The, LLC ("LHPT"). For the reasons that follow, we reverse the trial court's judgment and remand for further proceedings.

I. FACTUAL AND PROCEDURAL BACKGROUND

---

[1] We note that defendant-appellant Capitol City Cardiology, Inc. has not been an active participant in this appeal.

{¶ 2}   On or about June 12, 2006, Eastside MOB LLC ("Eastside") and Capitol City Cardiology, Inc. ("CCC") entered into a written lease agreement for office space in a medical office building located at 4882 East Main Street, Whitehall, Ohio (the "building"). The shareholders of CCC were Doctors Charles Noble, Reuben Sheares, Rajendra Patel, Michael Meleca, Shantanu Sinha, and Richard Bardales.  The lease agreement was for a period of 15 years through December 31, 2021.  The total annual rent for the first year of the lease agreement was $195,951.90, to be paid in monthly installments of $16,329.33. Rent for the remaining years was to be determined by adding base rent (calculated annually by multiplying the leased square footage by graduated rates in the lease agreement) by CCC's pro rata share of expenses associated with operating the building. None of CCC's shareholders signed a personal guarantee regarding CCC's obligations under the lease agreement.

{¶ 3}   CCC maintained several offices around the Columbus area, including the office located in the building (the "leased space").  CCC sometimes referred to the physicians groups that occupied its various offices as "pods" or "axes."  The group that practiced in the leased space was sometimes referred to as the "Columbus pod" or "Columbus axis."  This axis consisted of Drs. Noble, Sheares, and Patel.

{¶ 4}   On June 23, 2008, LHPT purchased the building from Eastside, and Eastside assigned its interest in the lease agreement to LHPT.  LHPT and CCC executed a tenant estoppel document in which CCC certified the lease agreement was in effect and was a valid and binding obligation of CCC.  CCC also certified LHPT had performed its obligations under the lease agreement.

{¶ 5}   By letter dated November 5, 2009, Tim Hill, practice administrator for CCC, informed LHPT that CCC was "contemplating dissolution" and that "if it dissolves, [CCC] will stop paying rent and [LHPT] can pursue [its] default remedies against [CCC]."  (R. 259, ¶ 35.)  Hill told LHPT it was "unlikely that [CCC] will have any assets from which you can collect anything."  (R. 259, ¶ 35.)  If CCC dissolved, some of CCC's doctors "might be interested in leasing the space" from LHPT.  (R. 259, ¶ 36.)  However, Hill advised LHPT that these doctors did not have the ability to pay the rent CCC was currently paying under the lease agreement.

{¶ 6}   On December 10, 2009, Drs. Noble, Sheares, and Patel formed NSP, an Ohio limited liability company.  On January 1, 2010, CCC ceased doing business and has not occupied the leased space since.  The last payment by CCC under the lease agreement, in the amount of $11,937.58, was made on April 1, 2010.

{¶ 7}   By letter dated January 27, 2010, LHPT was informed by Alterra Real Estate Advisors that NSP was interested in entering into "lease-renegotiations for their current office located at 4882 East Main St., 250 Columbus, Ohio."  (R. 259, ¶ 46.)  LHPT requested a number of documents from CCC and NSP to help it evaluate NSP's request.  NSP supplied certain information and proposed a reduction in rent for the leased space.  LHPT reviewed the lease agreement, concluded it did not contain an early termination clause, and decided not to let CCC "off the hook."  (R. 259, ¶ 52.)  Thus, LHPT chose not to negotiate with NSP.

{¶ 8}   On February 26, 2010, the owners of CCC, on behalf of themselves and CCC, executed an agreement (the "Wind Up Agreement")[2]  by which they formally adopted and agreed to the "Plan of Complete Liquidation and Winding Up of Capitol City Cardiology, Inc. (the 'Plan of Liquidation')" and agreed to "take such action and execute such documents and agreements as are reasonably necessary to carry out the terms of the 'Plan of Liquidation.' "  (R. 259, ¶ 55-56.)  The Plan of Liquidation formally divided CCC into the various "axes" referred to above and provided that "[t]he 'Columbus axis' consists of Drs. Noble, Patel and Sheares who operate the Columbus, Granville and Westerville offices."  (R. 259, ¶ 59.)  Section 2 of the Plan of Liquidation stated that "[a]ll references herein to an 'axis' shall include an entity or other organization designated by the members of such axis as an assignee or successor in interest of such members."  (R. 259, ¶ 59.)  Section 2 also stated that "[a]ll expenses associated with the operation of each separate axis (including, without limitation, lease obligations, operating expenses, physician and staff salaries) will be allocated to the respective individual axis."  (R. 259, ¶ 60.)

{¶ 9}   Section 3(C) of the Plan of Liquidation provided that "[t]he real estate leases for each of the offices shall be assigned to the axis which will operated [sic] such axis

---

[2] The shareholders of CCC also executed the Wind Up Agreement on behalf of a separate limited liability company they owned, Cap Cit, Ltd.  Cap Cit, Ltd., a holding company for certain assets, owned the medical equipment and office furniture CCC used in the leased space.

following the Effective Date by an Assignment of Lease ('Assignment of Lease') substantially in the form attached hereto as Exhibit 3C, or such other form as is approved by counsel for each axis, or the Shareholders of the respective axis will enter into a new lease for such offices.  * * *  [CCC] shall make all required lease payments prior to the Effective Date."  (R. 259, ¶ 63.)  Attached as exhibit No. 3C to the Plan of Liquidation was a blank and unsigned assignment of real estate lease form.  This blank form did not refer to or reference any specific property or lease.  The Plan of Liquidation stated that the "Effective Date shall be such date as is agreed to by the shareholder physicians following the satisfaction of all contingencies contained in the Plan, but in no event later than March 1, 2010."  (R. 259, ¶ 66.)

{¶ 10} In addition, section 14 of the Plan of Liquidation, entitled "Third Party Beneficiaries," provided:

> Nothing in this Plan, whether express or implied, is intended to confer any rights or remedies under or by reason of this Plan on any persons other than the Shareholders and the Corporation and the respective successors and assigns of the Shareholders, nor is anything in this Plan Agreement intended to give any third persons any right of subrogation or action over against any Shareholder or the Corporation.

(R. 259, ¶ 67.)  The Wind Up Agreement contained a similar provision.

{¶ 11} Other CCC axes, aside from NSP, were able to negotiate new leases with the landlords for their respective offices.  Following CCC's final payment under the lease agreement, Drs. Noble, Sheares, and Patel practiced in the building until approximately March 2011.  NSP made ten monthly payments to LHPT of $19,303.07 between May 1, 2010 and January 28, 2011.

{¶ 12} In May 2011, LHPT filed a complaint against CCC, its shareholders, NSP, and others.  After various proceedings, the only claims that remained for adjudication were claims for breach of lease against CCC and NSP and claims for fraudulent inducement and foreclosure of security interest against CCC only.  The parties submitted a joint stipulation of facts and submitted the matter for a bench trial based on stipulations, legal briefs, and arguments.

{¶ 13} Following the bench trial, the trial court issued a decision finding LHPT was not a third-party beneficiary to the Wind Up Agreement and related documents. However, in its findings of fact, the trial court also stated:

> NSP is nevertheless legally liable under the Lease Agreement as the assignee of CCC. NSP became an assignee by virtue of the Wind Up Agreement under which the three individual doctors (Noble, Sheares and Patel) dissolved former business relationships and took-over long term occupancy of the Main Street space from CCC. Their Plan of Complete Liquidation (at ¶ 3(C)) expressly contemplated an "assignment" of the existing lease or some new and comparable arrangement with the landlord. Drs. Noble, Sheares and Patel obtained releases from other doctors who had been practicing together with them in CCC, retained medical records for patients treated at Main Street, and confirmed their actual right to occupancy of the Main Street space for which they then paid rent for a number of months. LHPT, of course, acquiesced in that assignment by accepting NSP's occupancy plus rental payments over ma[n]y months.
>
> The court also takes note that a finding of joint legal liability against both CCC and NSP based upon assignment of the Lease Agreement is equitable because, despite the detailed Wind Up Agreement and related documents, the doctors splitting up CCC never made arrangements addressed to existing landlords like LHPT. For instance, there is no evidence that CCC rendered any accounting of their remaining assets against liabilities to third-party creditors like LHPT. For all one knows, the principals of old CCC retained significant money following dissolution of the old business, through collection of accounts receivable and other favorable disposition of CCC assets. Instead, the Wind Up Agreement was a pure walk-away. It protected individual doctors from claims against each other, helped to fund their retirement plans, and addressed other internal loose-ends like allocating patients to each office location. But, as to third party creditors like LHPT, the Wind Up neither accounted for residual assets and liabilities nor made formal assignment of assets (or other binding arrangements) to benefit known creditors. The law cannot reward business people who simply walk-away from long-term obligations under such circumstances.

(R. 301, at 4-5.)

{¶ 14} The trial court concluded "the combination of the Plan of Liquidation, repeated monthly payments of rent, continued occupancy of the Main Street premises for use in conjunction with the same business activities in which CCC had engaged, and lack of objection by either LHPT or NSP to this course of conduct created an enforceable assignment of the Lease from CCC to NSP." (R. 301, at 6.) In addition, the trial court found CCC's "failure to otherwise address its long-term liability" to LHPT supported the conclusion that CCC contemplated an assignment. (R. 301, at 6.)[3]

{¶ 15} The trial court found the statute of frauds was satisfied because a sufficiently full memorandum of the assignment from CCC to NSP existed. The trial court found the rent checks from NSP were no different from a simple memorandum of lease. The checks contained the identity of the landlord (LHPT) and tenant (NSP), monthly rental amount, location of the premises being leased, and stated they were for "Rent." Also, the trial court found *Abraham v. Akron Sausage Co.*, 34 Ohio App. 285 (9th Dist.1927) supported a finding that the statute of frauds was satisfied. Thus, the trial court found CCC and NSP jointly and severally liable for all obligations under the lease agreement and entered judgment against them for breach of the lease agreement in excess of $1.5 million. The trial court also awarded LHPT some attorney fees and expenses. The trial court dismissed the fraudulent inducement claim and entered judgment against CCC on the foreclosure of security interest claim.

## II. ASSIGNMENTS OF ERROR

{¶ 16} NSP appeals and presents three assignments of error for our review:

> 1. THE TRIAL COURT ERRED IN HOLDING THAT NSP BECAME AN ASSIGNEE OF CCC'S LEASE BY VIRTUE OF THE WIND UP AGREEMENT.
>
> 2. THE TRIAL COURT ERRED IN HOLDING THAT CCC AND NSP ARE JOINTLY LEGALLY LIABLE FOR CCC'S LEASE BY VIRTUE OF AN EQUITABLE ASSIGNMENT OF THAT LEASE BECAUSE "THE LAW CANNOT REWARD BUSINESS PEOPLE WHO SIMPLY WALK-AWAY FROM LONG-TERM OBLIGATIONS UNDER SUCH CIRCUM-STANCES."

---

[3] The trial court also found LHPT waived a provision in the lease agreement requiring its prior written consent before an assignment could become effective. (R. 412.) This finding is not in dispute on appeal.

> 3. THE TRIAL COURT ERRED IN HOLDING THAT RENT CHECKS ARE A MEMORANDUM OF LEASE THAT SATISFIES THE STATUTE OF FRAUDS.

## III. DISCUSSION

### A. Background

{¶ 17} An assignment is a transaction in which a lessee/assignor "transfers its entire interest in a premise for the unexpired term of the original lease to another party, an assignee." *Morse & Hamilton Ltd. Partnership v. Gourmet Bagel Co.*, 10th Dist. No. 99AP-1253 (Sept. 29, 2000), citing *N.R.I. Co. v. N.R. Dayton Mall, Inc.*, 2d Dist. No. 12528 (Nov. 1, 1991). "The assignment divests the lessee of any interest in the property and transfers it to the assignee." *Id.* However, the lessee remains in privity of contract with the original lessor and is not relieved of its express obligation to pay rent. *Id.*, citing *Smith v. Harrison*, 42 Ohio St. 180 (1884); *Harmony Lodge v. White*, 30 Ohio St. 569 (1876), paragraph one of the syllabus. "Instead, when a lease is assigned, the assignee becomes the principal obligor for rent payments and the lessee becomes a surety toward the lessor for the assignee's performance." *Morse & Hamilton*, citing *Gholson v. Savin*, 137 Ohio St. 551, 557 (1941).

{¶ 18} The dispute in this case, which centers on whether CCC assigned to NSP a lease agreement with approximately 11 years remaining in its term, implicates the statute of frauds. "In general, the term 'statute of frauds' refers to a provision that requires that certain agreements be in writing." *ELM Invests., Inc. v. BP Exploration & Oil, Inc.*, 10th Dist. No. 11AP-1000, 2012-Ohio-2950, ¶ 11. In Ohio, the General Assembly codified the statute of frauds in R.C. Chapter 1335. *See Ed Schory & Sons, Inc.*, 75 Ohio St.3d 433, 438 (1996). R.C. 1335.04 provides:

> No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law.

{¶ 19} Additionally, R.C. 1335.05 states in part:

> No action shall be brought whereby to charge the defendant * * * upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

"Where a plaintiff attempts to enforce an agreement against a defendant, the defendant may raise the statute of frauds as an affirmative defense." *ELM Invests., Inc.* at ¶ 11. An agreement that does not comply with the statute of frauds is unenforceable. *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, ¶ 32. "The purpose of the statute of frauds is to prevent 'frauds and perjuries.' " *Id.* at ¶ 33, quoting *Wilber v. Paine*, 1 Ohio 251, 255 (1824). "The statute does so by informing the public and judges of what is needed to form a contract and by encouraging parties to follow these requirements by nullifying those agreements that do not comply." *Id.*

## B.  Assignment via the Wind Up Agreement

{¶ 20} Under its first assignment of error, NSP contends the trial court erred when it found NSP became an assignee of the lease agreement by virtue of the Wind Up Agreement, which adopted the Plan of Liquidation

{¶ 21} The issue of whether the Wind Up Agreement complies with the statute of frauds presents a question of law we review de novo. *Fontbank, Inc. v. CompuServe, Inc.*, 138 Ohio App.3d 801, 812 (10th Dist.2000), citing *Ruhe v. Hemmelgarn*, 2d Dist. No. 96-CA-1423 (Aug. 22, 1997); *State v. Evans*, 10th Dist. No. 13AP-939, 2014-Ohio-2081, ¶ 9 (stating "where questions of law are in dispute, an appellate court reviews the trial court's determination de novo"). Also, "[t]he interpretation and construction of written contracts is a question of law subject to de novo review on appeal." *Hastings Mut. Ins. Co. v. Village Communities Real Estate, Inc.*, 10th Dist. No. 14AP-35, 2014-Ohio-2916, ¶ 13, citing *State v. Fed. Ins. Co.*, 10th Dist. No. 04AP-1350, 2005-Ohio-6807, ¶ 22, citing *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 576 (1998).

{¶ 22} "In order to constitute a 'memorandum or note' for purposes of satisfying the statute of frauds, [a] writing must 'contain words which can be reasonably construed

as words of promise or agreement or as an indication of any contract or agreement.' " *Khanna v. Grandparents Living Theatre, Inc.*, 10th Dist. No. 96APE12-1744 (Sept. 25, 1997), quoting *Sherman v. Johnson*, 159 Ohio St. 209 (1953), paragraph two of the syllabus; *Kling v. Bordner*, 65 Ohio St. 86 (1901). This court has previously stated that " '[a]ny signed memorandum is sufficient to satisfy the Statute of Frauds so long as it (1) identifies the subject matter of the agreement, (2) establishes that a contract has been made, and (3) states the essential terms with reasonable certainty.' " *Lamkin v. First Community Bank*, 10th Dist. No. 00AP-935 (Mar. 29, 2001), quoting *Busler v. D & H Mfg., Inc.*, 81 Ohio App.3d 385, 389 (10th Dist.1992), citing *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App.3d 342, 349 (8th Dist.1984).

{¶ 23} NSP maintains that the Wind Up Agreement does not accomplish an assignment of the lease agreement from CCC to NSP. NSP argues the Wind Up Agreement contemplates either an assignment or a new lease with regard to properties leased by CCC. According to NSP, it elected to negotiate a new lease with LHPT. LHPT maintains that because of NSP's lack of success in negotiating a new lease, an assignment of CCC's rights and responsibilities under the lease agreement occurred.

{¶ 24} We agree with NSP that the Wind Up Agreement did not accomplish an assignment to NSP. Section 3(C) of the Plan of Liquidation, which was formally adopted by CCC and its shareholders via the Wind Up Agreement, provided that "[t]he real estate leases for each of the offices *shall be assigned* to the axis which will operated [sic] such axis *following the Effective Date by an Assignment of Lease * * * substantially in the form attached hereto as Exhibit 3C, or such other form as is approved by counsel for each axis, or* the Shareholders of the respective axis will enter into a new lease for such offices." (Emphasis added.) (R. 259, ¶ 63.) As NSP points out, Section 3(C) does not simply assign CCC's leases to the different axes. Rather, Section 3(C) sets forth two possible outcomes for the spaces CCC leased—the lease agreements for the spaces would be assigned to the axes or the axes would negotiate new leases for the spaces.

{¶ 25} Section 3(C) does not indicate an assignment to an axis is automatic if the axis fails to successfully negotiate a new lease. Instead, section 3(C) requires additional action to accomplish an assignment, namely the execution of a document like the blank Assignment of Lease form attached to the Plan of Liquidation. Thus, the Wind Up

Agreement and accompanying Plan of Liquidation, taken alone, did not accomplish an assignment of the lease agreement at issue in this case.

{¶ 26} We note the record does not contain an executed Assignment of Lease or similar document with regard to the leased space. Also, a new lease was not negotiated for the leased space. Thus, neither result contemplated by the Plan of Liquidation for the leased space has occurred. However, "[u]nder Ohio law, only a party to a contract or an intended third-party beneficiary may bring an action on the contract." *Maghie & Savage, Inc. v. P.J. Dick Inc.*, 10th Dist. No. 08AP-487, 2009-Ohio-2164, ¶ 40, citing *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161 (1991). LHPT is not a party to the Plan of Liquidation or Wind Up Agreement. For LHPT to be an intended beneficiary, the contracting parties had to enter into the agreements with the intent to benefit LHPT. *See id.* at ¶ 41, citing *Doe v. Adkins*, 110 Ohio App.3d 427, 436 (4th Dist.1996). Here, both the Plan of Liquidation and Wind Up Agreement unambiguously disclaim any intent to benefit third parties. Thus, LHPT is not an intended third-party beneficiary, so even if it had sought an order to enforce section 3(C) of the Plan of Liquidation, its efforts could not have succeeded.

{¶ 27} For the foregoing reasons, we sustain the first assignment of error.

**C. Assignment via the Rent Checks**

{¶ 28} Under its third assignment of error, NSP contends the trial court erred when it found the rent checks from NSP to LHPT constituted a memorandum that satisfied the statute of frauds. Generally citing *N. Coast Cookies,* the trial court found a sufficiently full memorandum of assignment existed. The trial court found the rent checks were no different, legally, from a simple memorandum of lease. The rent checks contained key information, i.e., the identity of the landlord (LHPT), the identity of the tenant (NSP), the monthly rental amount, the location of the premises being leased, and indicated the checks were for "Rent." The trial court noted the law did not require a full-writing of a lease as part of an assignment.

{¶ 29} This court has previously cited *N. Coast Cookies* for the proposition that " '[a]ny signed memorandum is sufficient to satisfy the Statute of Frauds so long as it (1) identifies the subject matter of the agreement, (2) establishes that a contract has been made, and (3) states the essential terms with reasonable certainty.' " *Lamkin*, quoting

*Busler* at 389, citing *N. Coast Cookies* at 349.   In *N. Coast Cookies*, the Eighth District also stated that "[i]n the assignment of a long-term lease, the Statute of Frauds (R.C. 1335.05) is satisfied by a signed writing which sufficiently identifies the parties, the lease involved, and the consideration for the transfer." *Id.* at paragraph seven of the syllabus.

{¶ 30} To the extent the trial court's decision suggests the rent checks alone memorialize the existence of an assignment in this case, we agree with NSP that the trial court is incorrect.   Under R.C. 1335.04, a lease must be assigned by "deed, or note in writing, signed by the party assigning * * * it."  Here, the rent checks are not signed by the purported assignor, CCC.   Although the rent checks were signed by the party to be charged, i.e., NSP, as required by R.C. 1335.05, the checks do not establish a contract for assignment was made between CCC and NSP.   The rent checks make no mention of CCC, the lease agreement, or an assignment.   The rent checks do not indicate how NSP came into possession of the leased space.   As NSP points out, the rent checks also do not indicate when NSP's interest in the leased space would terminate.   At best, the rent checks indicate NSP was in possession of the leased space and paying monthly rent to LHPT for an indeterminate amount of time.   The rent checks do not indicate that NSP accepted from CCC a transfer of CCC's entire interest in the leased space for the unexpired term of the original lease agreement.   In other words, the checks do not establish with reasonable certainty that a contract for an assignment was made.

{¶ 31} LHPT contends the rent checks, when read together with the lease agreement, satisfy the statute of frauds.    "The memorandum in writing satisfying the requirement of the Statute of Frauds may consist of several related writings, even though only one such writing is signed, if the signed writing refers to the unsigned writing or if it appears by inspection and comparison of the writings that they logically relate to or form part of the same transaction." *Soteriades v. Wendy's of Ft. Wayne, Inc.*, 34 Ohio App.3d 222, 225 (10th Dist.1986), citing *Thayer v. Luce*, 22 Ohio St. 62 (1871), *McGilvery v. Shadel*, 87 Ohio App. 345 (6th Dist.1949), and Restatement of the Law 2d, Contracts, Section 208, at 543 (1979).  It is not readily apparent that the trial court relied on this rule in the present matter and concluded a sufficient memorandum of assignment existed based on the rent checks coupled with the lease agreement.   In any event, the lease agreement cannot fill in the gaps in information missing from the rent checks without a

writing indicating NSP agreed to comply with the lease agreement for the remainder of its term.  As we already explained, the Wind Up Agreement fails in this regard.

{¶ 32}  For the foregoing reasons, we sustain the third assignment of error.

**D.  Part Performance**

{¶ 33}  Under its second assignment of error, NSP contends the trial court erred in finding NSP and CCC jointly and severally liable to LHPT by virtue of an equitable assignment of the lease agreement.

{¶ 34}  NSP complains in part that the trial court's reliance on the Ninth District's decision in *Abraham*, which implicates the doctrine of part performance, is misplaced. " 'An agreement will be removed from operation of the Statute of Frauds only through the doctrines of partial performance and promissory estoppel.' "  *DeAscentisi v. Margello*, 10th Dist. No. 08AP-522, 2008-Ohio-6821, ¶ 26, quoting *Gunsorek v. Heartland Bank*, 124 Ohio App.3d 735, 740 (10th Dist.1997).  Promissory estoppel is not at issue here.

{¶ 35}  This court has previously found that a party seeking to invoke the doctrine of part performance must establish that he has performed acts in exclusive reliance on an oral contract, and that such acts have changed his position to his prejudice.  *DeAscentisi* at ¶ 26; *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio,* 174 Ohio App.3d 29, 2007-Ohio-5562, ¶ 43 (4th Dist.); *see generally Delfino v. Paul Davies Chevrolet, Inc.*, 2 Ohio St.2d 282, 287 (1965) (stating in the context of R.C. 5301.01's statute of conveyances that part performance sufficient to remove an agreement from the operation of the statute "must consist of unequivocal acts by the party relying upon the agreement, which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties *in statu quo. * * ** If the performance can reasonably be accounted for in any other manner or if plaintiff has not altered his position in reliance on the agreement, the case remains within the operation of the statute").  "In cases involving the sale or lease of real property, courts have required acts such as possession, payment of consideration, and improvements on the land in order to find part performance."  *DeAscentisi* at ¶ 26, citing *Clements v. Mayhew,* 2d Dist. No. 2006 CA 126, 2007-Ohio-3700, ¶ 58.

{¶ 36}  In *Abraham*, the plaintiff leased certain real estate to Akron Sausage Company, a partnership, in September 1919 for a period of five years.  In October 1919,

Akron Sausage Company, a corporation promoted by the same persons who composed the partnership, was incorporated. *Id.* at 287. According to the Ninth District, "[t]he record * * * show[ed] that a short time after the incorporation of said company, the partnership orally assigned its lease to said company, and the company went into the possession of the * * * property and paid the rent stipulated in the lease until it abandoned possession of the property in October, 1923." *Id.* Applying the doctrine of part performance, the Ninth District found the contract at issue was removed from the statute of frauds. *Id.* at 288-93.

{¶ 37} Here, the trial court found that *Abraham* supported a finding that an enforceable assignment existed because *Abraham* "also involved related entities, a lease assignment (albeit oral), and continued occupancy coupled with payment of rent, which the Ninth District concluded were sufficient to take the agreement out of the Statute of Frauds." (R. 301, at 7.) Aside from the fact that *Abraham* is persuasive, not binding authority, we are not convinced *Abraham* and the present case are analogous. The *Abraham* court found the record before it showed the partnership orally assigned its lease to the corporation but did not elaborate on what evidence supported this conclusion. Therefore, we are left to speculate as to how this evidence impacted the result in *Abraham*. Moreover, in this case, the parties did not stipulate an oral assignment occurred, and the trial court did not make such a finding. Contrary to the suggestion of the trial court and LHPT, the record does not contain a written assignment that somehow makes this case comparable to *Abraham*. If the record had contained a written assignment, consideration of the doctrine of part performance would not be necessary.[4]

{¶ 38} LHPT contends no legitimate explanation for NSP's payment of rent and possession of the leased space exists aside from an assignment of the lease agreement.

---

[4] In its appellate brief, LHPT cites deposition testimony of Steve Toukan, CPA, who testified on behalf of CCC, as evidence that CCC assigned its leases to the respective axes. Counsel for LHPT read to Toukan the first sentence of section 3(C) of the Plan of Liquidation, i.e., the sentence indicating CCC's leases would be assigned or new leases would be entered into for the leased spaces. Then counsel asked Toukan, "Did that, in fact, happen?" (Steve Toukan Depo. 190.) Toukan responded, "Yes," over objection by counsel for NSP. (Toukan Depo. 190) Counsel for LHPT then stated, "I understand you're not an attorney, but what do you explain this to mean and what was the process?" (Toukan Depo. 190.) Over objection, Toukan stated, "That the physical real estate that they were in, they assumed the leases." (Toukan Depo. 190.) Even if we overlook the fact that the trial court never ruled on the objections and did not rely on Toukan's testimony in its decision, the testimony is vague and does not demonstrate NSP accepted CCC's entire interest in the leased space for the unexpired term of the original lease agreement.

NSP implies that it had an informal arrangement with CCC under which NSP could possess the leased space and pay rent for it. NSP maintains it never agreed to take on CCC's obligations for the remainder of the lease term.

{¶ 39} The record does not reflect actions by any of the parties which are exclusively referable to the existence of an assignment. NSP's possession of the leased space and rent payments,[5] similar to LHPT's acceptance of the rent checks and the implicit consent of CCC and LHPT to the possession, are just as consistent with the existence of an assignment as the informal arrangement suggested by NSP. Although the trial court found it significant that CCC and NSP engaged in the same type of activities in the leased space, that fact does not lend itself to the conclusion that NSP accepted CCC's obligations for the approximately 11 years remaining on the lease agreement. Additionally, the record does not reflect that LHPT or CCC, whom LHPT claims to be in privity with, changed their positions in reliance on an assignment of the lease agreement to their detriment. For instance, there is no evidence that LHPT made changes to the leased space in anticipation of long-term occupation by NSP.[6] Thus, the doctrine of part performance is not applicable, and the trial court erred when it found NSP liable for breach of the lease agreement between CCC and LHPT.

{¶ 40} Under its second assignment of error, NSP also takes issue with the trial court's finding that it was equitable to impose joint liability on CCC and NSP in light of what the trial court viewed as efforts of CCC's shareholders to protect themselves and avoid obligations to creditors like LHPT. NSP's claim is moot. Regardless of how the trial court viewed the shareholders' actions, it could not find NSP liable for breach of the lease agreement because the alleged assignment of that agreement to NSP did not comply with the statute of frauds, and no exception removed the alleged assignment from the operation of the statute of frauds.

{¶ 41} Next, NSP complains about the trial court's statement that CCC's failure to otherwise address its long-term liability to LHPT supported the conclusion that CCC

---

[5] We note the parties' joint stipulation of facts provides a general formula for calculation of rent payments under the lease agreement. There does not appear to be a dispute that NSP's monthly payments were the equivalent of the amounts owed under the lease agreement, but that fact is not clear from the stipulation.
[6] LHPT did present evidence, through an affidavit attached as an exhibit to the stipulated facts, that it invested over $479,000 to improve the leased space for CCC.

contemplated an assignment. However, we fail to see how this finding impacts our conclusion that no writing satisfies the statute of frauds and the part performance doctrine does not apply. Thus, NSP's contention is moot.

{¶ 42} For the foregoing reasons, we sustain the second assignment of error in part and render it moot in part.

## IV. CONCLUSION

{¶ 43} We sustain the first and third assignments of error. We sustain the second assignment of error in part and render it moot in part. Accordingly, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings consistent with this decision.

*Judgment reversed and cause remanded.*

CONNOR and DORRIAN, JJ., concur.

––––––––––––––